Jordan L. Lurie (SBN 130013)
Jordan.Lurie@capstonelawyers.com
Robert Friedl (SBN 134947)
Robert.Friedl@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Capstone Law APC
1840 Century Park East, Suite 450
Los Angeles, California 90067
Telephone:  (310) 556-4811
Facsimile:  (310) 943-0396

Russell D. Paul
rpaul@bm.net
Eric Lechtzin
elechtzin@bm.net
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Telephone:  (215) 875-3000
Facsimile:  (215) 875-4604

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAUREEN CUSICK. TONYA PATZE, PATRICIA SOLTESIZ, LINDSAY SCHMIDT, JOSHUA BRUNO, VIRGINIA OTTE, PATRICIA SCHWENNKER, JASON PORTERFELD, JAMIE PORTERFELD, ABIGAIL FISHER, CHRISTI GROSHONG, and ERIC DUFOUR, individually, and on behalf of a class of similarly situated individuals, | Case No.: 2:15-cv-8831 <br> _____ <br><br> **CLASS ACTION COMPLAINT** |
| Plaintiffs, | (1)  Violation of the Arizona Consumer Fraud Act |
| v. | (2)  Violation of California Consumer Legal Remedies Act |
| FORD MOTOR COMPANY, a Delaware corporation, | (3)  Violation of Unfair Competition Law |
| Defendant. | (4)  Breach of Implied Warranty pursuant to Song-Beverly Consumer Warranty Act |
| | (5)  Breach of Express Warranty under Cal. Com. Code § 2313 |
| | (6)  Violation of Colorado Consumer Protection Act |
| | (7)  Violation of Illinois Consumer Fraud and Deceptive Business Practices Act |
| | (8)  Violations of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, Et Seq. |
| | (9)  Violation of New York General |

Business Law §§ 349, 350

(10) Violation of the Oregon Unlawful Trade Practices Act

(11) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law

(12) Violation of the Washington Consumer Protection Act

(13) Breach of Implied Warranty of Merchantability-Wash. Rev. Code § 62A.2-614

(14) Breach of Warranty under the Magnuson-Moss Warranty Act

(15) Breach of Express Warranty

(16) Breach of the Implied Warranty Of Merchantability

(17) Breach of The Duty Of Good Faith And Fair Dealing

(18) Unjust Enrichment

**DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1.     Plaintiffs Maureen Cusick, Tonya Patze, Patricia Soltesiz, Lindsay Schmidt, Joshua Bruno, Virginia Otte, Patricia Schwennker, Jason Porterfeld, Jamie Porterfeld, Abigail Fisher, Christi Groshong, and Eric Dufour ("Plaintiffs") bring this action for themselves and on behalf of all persons in the United States who purchased or leased any vehicle designed, manufactured, marketed, distributed, sold, warranted and serviced by Ford Motor Company ("Ford" or "Defendant") and equipped with Ford's PowerShift dual clutch transmission ("Dual Clutch Transmission" or "PowerShift Transmission") (collectively, "Class Vehicles").  The PowerShift transmission is defective and poses serious safety concerns.

2.     Plaintiffs are informed and believe, and based thereon, allege that the PowerShift Transmission is defective in its design and/or manufacture in that, among other problems, the transmission slips, bucks, kicks, jerks and harshly engages; has premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration and difficulty stopping the vehicle, and eventually suffers a catastrophic failure (the "Transmission Defect").

3.     Ford has never acknowledged publicly that the Transmission Defect even exists.  To the contrary, Ford actively concealed, and continues to conceal, the Transmission Defect by, among other things, telling customers that the symptoms associated with the Transmission Defect were "normal driving conditions."  Ford issued multiple Technical Service Bulletins ("TSBs") *to dealers* but never directly notified consumers of known problems with the PowerShift Transmission.  Ford further perpetuated its cover-up by ultimately issuing two "Customer Satisfaction Programs" that simply offered additional ineffectual repairs without disclosing the truth about the Transmission Defect. Customers whose vehicles were supposedly repaired pursuant to the Customer Satisfaction Programs have nevertheless continued to experience the

Transmission Defect.  The Transmission Defect has no known repair.

4.     None of the information in the market that discussed the Transmission Defect disclosed, fully or at all, the material facts known only to Ford, including that the PowerShift Transmission had serious problems since its early development that Ford simply was unable to fix and that rendered the Class Vehicles unsafe to drive.  The PowerShift Transmission was a new technology to Ford that Ford rushed to the market without disclosing the problems described above so that Plaintiffs and the Class could make informed purchasing decisions.

5.     Piecemeal statements in the market about the performance of the PowerShift Transmission do not excuse Ford's failure to disclose.  Only Ford knew the full truth about the Transmission Defect.  It was Ford's obligation to disclose the material facts that only Ford knew about.

6.     This defect poses an obvious and serious safety concern.  Many class members have complained of their vehicles lurching into or losing power in traffic.  *See* Paragraph 68, *infra*.  The following 2011 Fiesta owner's complaint to the National Highway Traffic Safety Administration is just one example:

> I WAS PULLING OUT OF A COUNTY PARK AFTER DARK, AND WAS TRYING TO GAUGE THE DISTANCE OF AN INCOMING CAR, TO DETERMINE WHETHER OR NOT I HAD TIME TO PULL OUT. IN ORDER TO SEE BETTER, I LIGHTLY PRESSED THE ACCELERATOR, BUT INSTEAD OF SLOWLY INCHING FORWARD A FEW INCHES OR A FOOT, MY CAR LEAPT OUT INTO THE PATH OF THE ONCOMING CAR AND THEN STOPPED. I TRIED TO THROW THE CAR IN REVERSE, BUT THERE WASN'T TIME TO REACT. THE OTHER DRIVER TRIED TO SLOW DOWN AND SWERVE TO AVOID ME, BUT WAS UNABLE TO AVOID HITTING MY DOOR. ME, MY THREE CHILDREN, AND THE DRIVER OF THE OTHER CAR WERE ALL TAKEN TO THE HOSPITAL BY AMBULANCE. THE CHILDREN WERE NOT ADMITTED, AS THEY ONLY HAD A FEW BRUISES, BUT THE OTHER DRIVER AND I WERE BOTH ADMITTED AND SUBSEQUENTLY RELEASED THAT SAME NIGHT. I RECEIVED A CITATION FOR FAILING TO YIELD, WHICH I PLAN ON CONTESTING. MY CAR HAS LEAPT

OUT INTO A CROSS-STREET LIKE THAT AFTER STOPPING FOR STOP SIGNS SEVERAL TIMES, BUT ALWAYS TO A LESSER EXTENT, AND NEVER ON A BUSY STREET. IT ALWAYS TAKES SEVERAL SECONDS AFTER THIS OCCURS FOR THE ACCELERATOR TO FUNCTION AGAIN, WHICH IS WHY I TRIED TO THROW MY CAR IN REVERSE INSTEAD OF DRIVING FORWARD. I HAVE ALSO HAD PROBLEMS WITH MY TRANSMISSION SHUDDERING PROFUSELY UPON EXCELLERATING AFTER STOPS. I RECEIVED A NOTICE FROM FORD DATED AUGUST 2014, STATING THAT THEY WERE EXTENDING THE WARRANTY ON MY CLUTCH AND TRANSMISSION INPUT SHAFT SEALS, AND TRANSMISSION SOFTWARE CALIBRATION TO 7 YEARS OR 100,000 MILES, BECAUSE OF THESE TYPES OF PROBLEMS, AND URGING ME TO HAVE THEM REPAIRED IF EXPERIENCING SHUDDERING. BECAUSE OF MY HUSBAND'S WORK SCHEDULE, WE HAD NOT GOTTEN AROUND TO HAVING THE SEALS REPLACED YET AS RECCOMENDED. I FEEL THAT THE TRANSMISSION ISSUES THAT I HAD BEEN HAVING WITH MY CAR, ARE DIRECTLY RESPONSIBLE FOR MY COLLISION, AND COULD EASILY HAVE RESULTED IN THE DEATHS OF 5 PEOPLE. *TR (Safecar.gov, *Search for Complaints* (November 11, 2015), http://www-odi.nhtsa.dot.gov/complaints/).

7.      In 2010, Ford knew of the Transmission Defect and began issuing TSBs to its dealerships in an effort to address it.  But Ford never communicated the TSBs, or the information they contained, directly to the class.  Instead, Ford prepared a separate series of intentionally sanitized documents for its customers to induce them into believing that their kicking, bucking, suddenly accelerating and sling-shotting vehicles were exhibiting "normal driving characteristics."

8.      The problems plaguing the PowerShift Transmission cannot be chalked up to "normal driving characteristics."  Such language is belied by the fact that, on information and belief, Ford has replaced thousands, if not tens of thousands, of Class Vehicles' PowerShift Transmissions, clutches, or both, due to early catastrophic transmission failure.

9.      The great majority of class members received no such replacement,

however, and even if they did, the replacement transmissions are likewise defective.  Typically, when Class Vehicle owners whose vehicles are exhibiting the Transmission Defect's manifestations bring their vehicles into Ford dealerships to complain, Ford dealerships tell class members that their vehicles are operating normally.  Ford does not disclose, and has not disclosed, that the PowerShift Transmission suffers from a defect or that the PowerShift Transmission is unsafe.

10.    Ford dealerships will sometimes provide "software flashes/updates" to Class Vehicles that are exhibiting the Transmission Defect.  However, these software flashes are ineffective, and class members are forced to come back to the dealerships, typically several times each year, complaining of the same transmission problems.  The Class Vehicles receive multiple, ineffective software flashes, and class members are told their Class Vehicles' transmissions are operating normally.

11.    Ford dealerships will also sometimes perform repairs to or replacements of the clutch components of the PowerShift Transmission, but those repairs are likewise ineffective, and on information and belief, may require waiting up to six months for replacement parts to become available, if not longer.

12.    Indeed, this pattern is so prevalent that Ford prepared a handout for its dealers entitled "PowerShift 6-Speed Transmission Operating Characteristics."  Ford drafted this document and provided it to its dealers to give to customers whose vehicles were exhibiting the Transmission Defect, in an apparent attempt to induce customers into believing the problems they were experiencing were "normal driving characteristics."  Nothing in this handout discloses that the PowerShift Transmission is defective.

13.    In August 2014, Ford issued a "Customer Satisfaction Program: Program Number 14M01," telling Class Vehicle owners that their vehicles "may . . . exhibit excessive transmission shudder during light acceleration.  This

condition may be caused by fluid contamination of the clutch due to leaking transmission seals."  Significantly, Ford did not issue a recall and did not warn drivers of the safety risks associated with these known problems.  Further, this campaign was only disseminated to owners and not prospective buyers.  Ford merely offered more ineffective "repairs" that do not actually fix the problem.  On information and belief, owners who have had this program performed on their vehicles continued to complain of the Transmission Defect as their vehicles were never repaired.

14.    Ford's "Customer Satisfaction Program: Program Number 14M01" letter was highly selective.  Despite Ford's knowledge of the following, Ford did *not* disclose that the PowerShift transmission was defective, and did not disclose the PowerShift transmission exhibits transmission slips, bucking, kicking, jerking, harsh engagement, premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration, difficulty stopping the vehicle, or transmission failure.

15.    Ford then released, in February of 2015, "Customer Satisfaction Program: Program Number 14M02," informing the class that their Class Vehicles may suffer from symptoms of loss of transmission engagement while driving, no-start, or a lack of power.  Ford blamed these symptoms on failures in the Transmission Control Module ("TCM").  Still, Ford did not issue a recall for the repeatedly failing and dangerous PowerShift Transmission, and this campaign was only disseminated to owners, not prospective purchasers.  Ford merely offered more ineffective "repairs" that do not actually fix the problem.  On information and belief, owners who have had this program performed on their vehicles continued to complain of the Transmission Defect as their vehicles were never repaired.

16.    Ford has never been able to repair the transmission.  On information and belief, owners have complained of accidents and serious injuries as a result

of the Transmission Defect.  However, Ford continues to dangerously sell the defective vehicles to consumers.

### Background – The PowerShift Transmission

17.     The PowerShift Transmission is a $1,095.00 option for the Class Vehicles.

18.     Ford designed and marketed its "PowerShift Transmission" as a more advanced and fuel-efficient alternative to a traditional manual or automatic transmission and offered it as the sole "Automatic" option in the Class Vehicles.

19.     Traditional manual transmissions use a driver-controlled clutch.  By pressing and releasing a foot pedal, the driver engages and disengages the engine from the transmission, allowing the vehicle to travel smoothly while the driver manually changes gears.

20.     In contrast, typical automatic transmissions free the driver from operating the clutch through the use of a fluid-filled device called a torque converter.  The torque converter substitutes for the manual transmission's clutch, transmitting power from the engine to the transmission through a fluid medium.

21.     While typical automatic transmissions offer increased convenience, they are generally less fuel-efficient and slower-shifting than their manual counterparts.  This is because the torque converter transfers power less efficiently than a clutch.  As a result, Ford marketed and sold its PowerShift Transmission as a "best of both worlds" alternative, offering a manual transmission's fuel economy with an automatic transmission's ease of operation and shift quality.

22.     Ford's PowerShift Transmission, while sometimes referred to as an "automatic," is actually a set of computerized manual transmissions.  It lacks a torque converter, instead using two "dry" clutches to directly engage and disengage the engine with and from the transmission.  Whereas similar "automated manual" transmissions on the market use "wet" clutches bathed in

CLASS ACTION COMPLAINT

oil, Ford's PowerShift Transmission clutches lack the oil pumps and other components of a wet clutch system, and instead operate "dry."

23.    Ford designed the Class Vehicles' computerized "automated manual" transmissions in an effort to meet heightened governmental and consumer expectations for fuel economy, performance, and efficiency. According to Ford's own press release, dated March 10, 2010, "PowerShift with dry-clutch facings and new energy-saving electromechanical actuation for clutches and gear shifts saves weight, improves efficiency, increases smoothness, adds durability and is sealed with low-friction gear lubricant for the life of the vehicle.  This transmission requires no regular maintenance."[1]

24.    Theoretically, an "automated manual" transmission, *i.e.*, the PowerShift Transmission, should have the convenience of an automatic transmission without sacrificing the fuel efficiency and shift speed of a manually-shifted vehicle.  In practice, however, Ford's PowerShift Transmission is plagued by numerous problems and safety concerns, rendering the vehicle virtually inoperable.

25.    The Transmission Defect causes unsafe conditions, including, but not limited to, Class Vehicles suddenly lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion.  These conditions present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration.  As an example, these conditions may make it difficult to safely merge into traffic.  Even more troubling, the Transmission Defect can cause the vehicle to fail to downshift and decelerate

---

[1] *See* PRNewswire.com, "PowerShift Transmission Production Begins, Driving Ford Small Car Fuel Economy Leadership," http://www.prnewswire.com/news-releases/powershift-transmission-production-begins-driving-ford-small-car-fuel-economy-leadership-89373007.html (last visited February 4, 2015).

CLASS ACTION COMPLAINT

when the brakes are depressed.  As a result, Plaintiffs and Class Members have experienced their cars lurching forward into intersections at red lights due to the failure of their braking efforts to stop the car.

26.     On information and belief, the Transmission Defect also causes premature wear to the PowerShift Transmission's clutch plates and other components, which can result in premature transmission failure and requires expensive repairs, including replacement of the transmission and its related components.

### Ford's Knowledge

27.     Beginning as early as 2010, Defendant knew or should have known that the Class Vehicles and the PowerShift Transmission was defective it its design and/or manufacture and that adversely affect the drivability of the Class Vehicles and cause safety hazards.

28.     Plaintiffs are informed and believe and based thereon allege that prior to the sale of the Class Vehicles, Defendant knew, or should have known, about the Transmission Defect through its exclusive knowledge of non-public, internal data about the Transmission Defect, including: pre-release testing data; early consumer complaints about the Transmission Defect to Defendant's dealers who are their agents for vehicle repairs; warranty claim data related to the defect; aggregate data from Ford's dealers; consumer complaints to the National Highway Traffic Safety Administration  ("NHTSA") and resulting notice from NHTSA; dealership repair orders; testing conducted in response to owner or lessee complaints; TSBs applicable to the Class Vehicles; the existence of the defect in the substantially identical European and Australian model vehicles; and other internal sources of aggregate information about the problem.  Nevertheless, Defendant has actively concealed and failed to disclose this defect to Plaintiffs and Class Members at the time of purchase or lease and thereafter.

29.     The Ford Fiesta and Ford Focus have the same or substantially

1    identical optional PowerShift Transmission, and the Transmission Defect is the

2    same for both vehicles.  In fact, the PowerShift Transmission in the Class

3    Vehicles is universally referred to by Ford as the "DPS6 automatic

4    transmission."

5          30.    Before offering the vehicle for sale in the United States, Ford

6    offered the same vehicles, equipped with a similar dual-clutch transmission, in

7    Europe and Australia.  Although the American version utilizes dry-clutches as

8    opposed to the European and Australian version's wet-clutches, Ford

9    acknowledged that the transmission offered for sale in the United States is

10   "derivative" of the design from the European and Australian models.[2]  European

11   and Australian versions of the dual-clutch transmission suffered from similar

12   defects known to Ford as alleged herein.

13         31.    On information and belief, despite developing and patenting the

14   THF technology and spending approximately 6,000 man-hours of computer-

15   aided mathematical modeling, simulation and analysis of engine speeds, torque

16   and clutch capacity as well as spending over $550 million to build a new

17   transmission manufacturing facility with Getrag in Mexico to produce the

18   Powershift Transmission, Ford is now canceling the PowerShift program many

19   years prior to its estimated end date.

20         32.    As a result of the Transmission Defect, in 2010 and 2011, Ford

21   issued several TSBs to its dealers in the United States, but not its customers[3],

22   acknowledging problems in the PowerShift Transmission.  For example, Ford's

23

24         [2] *See* Autoblog.com, "Ford officially announces dual clutch PowerShift
     gearbox for 2010," http://www.autoblog.com/2009/01/21/ford-officially-
25   announces-dual-clutch-powershift-gearbox-for-201/ (last visited February 4,
     2015).

26         [3] Some, but not all, service bulletins are available through the website for
     the Office of Defect Investigations of the National Highway Traffic Safety
27   Administration.

28

CLASS ACTION COMPLAINT

TSB from September 2010, covering the 2011 Ford Fiesta, informed dealers of "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or a check engine light with transmission control module (TCM) diagnostic trouble code . . . ."

33.     Similarly, Ford's TSB released on January 1, 2011, covering the 2011 Ford Fiesta with the PowerShift Transmission, informs dealers of problems with the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."

34.     Throughout 2011, Ford continued to issue various TSBs covering the Ford Fiesta and Ford Focus vehicles which advised dealers of the continuing transmission problems.  For example, a Ford TSB released in September 2011 advised dealers to reprogram the transmission computer if 2011 Ford Fiesta owners complained about "hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop."

35.     Because Ford will not notify Class Members that the PowerShift Transmission is defective, Plaintiffs and Class Members (as well as members of the general public) are subjected to dangerous driving conditions that often occur without warning.

36.     The alleged Transmission Defect was inherent in each Ford Fiesta and Ford Focus' PowerShift Transmission and was present in each Ford Fiesta and Ford Focus' PowerShift Transmission at the time of sale.

37.     Ford knew about and concealed the Transmission Defect present in every Class Vehicle, along with the attendant dangerous safety and driveability problems, from Plaintiffs and Class Members, at the time of sale, lease, and repair and thereafter.  In fact, instead of repairing the defects in the PowerShift Transmission, Ford either refused to acknowledge the defects' existence or

performed ineffective software upgrades or other repairs that simply masked the defect.

38.     If Plaintiffs and the Class Members had known about these defects at the time of sale or lease, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them.

39.     As a result of their reliance on Defendant's omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles, including, but not limited to, the $1,095.00 cost of the optional PowerShift transmission, out-of-pocket costs related to repairs to the PowerShift Transmission.  Additionally, as a result of the Transmission Defect, Plaintiffs and the Class Members were harmed and suffered actual damages in that the Class Vehicles' transmissions and related components are substantially certain to fail before their expected useful life has run.  Plaintiffs also seek injunctive relief in the form of extended warranties for all Class Vehicles.

**PARTIES**

**Plaintiff Maureen Cusick**

40.     Plaintiff Maureen Cusick is a California resident, who resides in Long Beach, California.

**Ford Focus**

41.     On or about October 20, 2012, Plaintiff purchased a new 2013 Ford Focus from Cerritos Ford Lincoln, an authorized Ford dealer in Cerritos, California.  Her vehicle was equipped with an optional PowerShift Transmission that cost her $1,095.00.

42.     Plaintiff purchased her vehicle primarily for personal, family, or household use.  Ford manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

43.     Passenger safety, vehicle performance, gas mileage, and reliability

were all factors in Plaintiff's decision to purchase her vehicle.  Prior to purchasing her Class Vehicle, Plaintiff researched the vehicle on Ford's official website and subsequently test drove the vehicle.  Had Ford disclosed its knowledge of the Transmission Defect, and the fact that it posed a safety concern, when Plaintiff purchased her 2013 Ford Focus, Plaintiff would have seen such disclosures and been aware of them.  Indeed, Ford's omissions were material to Plaintiff.  Like all members of the classes, Plaintiff would not have purchased her 2013 Ford Focus, or would not have paid the purchase price charged by Ford, had she known that the PowerShift Transmission is prone to premature internal wear and failure, that it suffers from transmission slips, bucking, kicking, jerking, harsh engagement, sudden acceleration, delay in downshifts, delayed acceleration, and difficulty stopping the vehicle.

44.    Within the first year after purchase, Plaintiff's transmission was shuddering, jerking, and exhibiting sudden acceleration and/or delayed acceleration.  Shortly after the problems arose, she brought the vehicle to Caruso Ford Lincoln, an authorized Ford dealer in Long Beach, California, complaining that Plaintiff's transmission was causing jerking, shuddering, and delayed acceleration.  The service technician inspected the vehicle and reprogrammed the vehicle's Transmission Control Module.

45.    In or around October 2015, while attempting to accelerate from a stop, the vehicle's transmission failed to accelerate and stalled in the middle of oncoming traffic.  Plaintiff continued to hold down the accelerator and was eventually able to accelerate, narrowly avoiding a collision.

46.    Following said incident, on or about October 24, 2015, with approximately 33,519 miles on the odometer, Plaintiff brought her vehicle to Caruso Ford Lincoln complaining that the vehicle's transmission was shuddering and hesitating to accelerate.  The service technician informed Plaintiff that the issues were related to the vehicle's transmission and she needed to bring her

1  vehicle back when a transmission technician was available.

2  47.    On or about October 26, 2015, with approximately 33,524 miles on

3  the odometer, Plaintiff returned to Caruso Ford Lincoln complaining that

4  Plaintiff's transmission was failing to accelerate, stalling, shuddering, and

5  hesitating to accelerate.  The service technician performed a multi-point

6  inspection and reprogrammed the vehicle's Transmission Control Module.

7  48.    Plaintiff's vehicle continues to exhibit all of the problems she had

8  previously complained about to authorized Ford dealer.

9  49.    Ford's authorized dealership has failed to adequately repair

10  Plaintiff's vehicle.  Despite these repair attempts by Ford and its dealers,

11  Plaintiff's transmission continues to shift erratically, and cause bucking, kicking,

12  jerking, harsh engagement, delayed acceleration, lurching, erratic shifting, and a

13  delay in downshifts.

14  50.    At all times, Plaintiff, like all Class Members, has driven her vehicle

15  in a foreseeable manner and in the manner in which it was intended to be used.

16  **Plaintiff Tonya Patze**

17  51.    Plaintiff Tonya Patze is an Arizona resident, who resides in Tucson,

18  Arizona.

19  **Ford Focus**

20  52.    On or about March 12, 2014, Plaintiff purchased a new 2014 Ford

21  Focus from Jim Click Ford Lincoln, an authorized Ford dealer in Tucson,

22  Arizona.  Her vehicle was equipped with an optional PowerShift Transmission

23  that cost her $1,095.00.

24  53.    Plaintiff purchased her vehicle primarily for personal, family, or

25  household use.  Ford manufactured, sold, distributed, advertised, marketed, and

26  warranted the vehicle.

27  54.    Passenger safety, vehicle performance, gas mileage, and reliability

28  were all factors in Plaintiff's decision to purchase her vehicle.  Prior to

purchasing her Class Vehicle, Plaintiff researched the vehicle on Ford's official website and subsequently test drove the vehicle.  Had Ford disclosed its knowledge of the Transmission Defect, and the fact that it posed a safety concern, when Plaintiff purchased her 2014 Ford Focus, Plaintiff would have seen such disclosures and been aware of them.  Indeed, Ford's omissions were material to Plaintiff.  Like all members of the classes, Plaintiff would not have purchased her 2014 Ford Focus, or would not have paid the purchase price charged by Ford, had she known that the PowerShift Transmission is prone to premature internal wear and failure, that it suffers from transmission slips, bucking, kicking, jerking, harsh engagement, sudden acceleration, delay in downshifts, delayed acceleration, and difficulty stopping the vehicle.

55.     Within the first four months after purchase, Plaintiff's transmission was shuddering, jerking, and exhibiting sudden acceleration and delayed acceleration.

56.     On or about July 9, 2014, with approximately 8,273 miles on the odometer, Plaintiff brought her vehicle to Jim Click Ford Lincoln complaining that her vehicle's transmission was failing to engage gears and causing delayed acceleration, most notably from a complete stop.  The service technician performed a multi-point inspection and reprogrammed the vehicle's Transmission Control Module per TSB 14-0047.  After further testing, the service technician noted that Plaintiff's vehicle "runs same as like equipped vehicles."   However, Plaintiff continued to experience the same problems complained about to Ford dealer.

57.     Additionally, on or about August 8, 2014, with approximately 9,872 miles on the odometer, Plaintiff brought her vehicle to Holmes Tuttle Ford Lincoln, a Ford authorized dealer in Tucson, Arizona, complaining that her vehicle's transmission "slips and jerks" on acceleration.  Following inspection, the Ford service technician performed repairs per TSB 14-0131.

58.     Additionally, on or about October 1, 2014, with approximately 12,960 miles on the odometer, Plaintiff brought her vehicle again to Holmes Tuttle Ford Lincoln complaining that her vehicle's transmission continued to exhibit shuddering, jerking, delayed acceleration, and complete failure to accelerate.  The Ford service technician inspected the vehicle, verified Plaintiff's concerns; and performed repairs per TSB 14-0131 and replaced transmission seals and clutch assembly.

59.     Further, on or about August 19, 2015, with approximately 28,857 miles on the odometer, Plaintiff returned her vehicle to Jim Click Ford Lincoln complaining that her vehicle's transmission was excessively shuddering and jerking during normal operation.  The Ford service technician inspected Plaintiff's vehicle and reprogrammed the Transmission Control Module.

60.     Further, on or about September 16, 2015, with approximately 30,874 miles on the odometer, Plaintiff returned her vehicle to Jim Click Ford Lincoln complaining that her vehicle's transmission was shuddering, jerking, and failing to accelerate despite RPMs spiking.  The Ford service technician inspected Plaintiff's vehicle and verified her concerns.  He performed repairs per TSB 15-0120 including reprogramming the Powertrain Control Module and Transmission Control Module.

61.     On or about September 30, 2015, with approximately 31,298 miles on the odometer, Plaintiff brought her vehicle to Jim Click Ford Lincoln complaining that her vehicle's transmission was excessively shuddering and jerking.  The Ford service technician inspected Plaintiff's vehicle and determined that further inspection would be required including monitoring the vehicle's performance during normal operation by Plaintiff with service technician present in vehicle.  No repairs were performed at that time.

62.     Additionally, on or about November 4, 2015, with approximately 33,000 miles on the odometer, Plaintiff brought her vehicle to Jim Click Ford

Lincoln complaining that her vehicle continued to excessively shudder and jerk during normal operation.  The Ford service technician rode in Plaintiff's vehicle while she drove and confirmed Plaintiff's concerns.  The technician informed Plaintiff that transmission repairs were required but that the parts were not available and she would be notified when they became available.

63.    Plaintiff's vehicle continues to exhibit all of the problems she had previously complained about to authorized Ford dealer.

64.    Ford's authorized dealership has failed to adequately repair Plaintiff's vehicle.  Despite these repair attempts by Ford and its dealers, Plaintiff's transmission continues to shift erratically, and cause bucking, kicking, jerking, harsh engagement, delayed acceleration, lurching, erratic shifting, and a delay in downshifts.

65.    At all times, Plaintiff, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Plaintiff Patricia Soltesiz**

66.    Plaintiff Patricia Soltesiz is a Colorado resident, who resides in Aurora, Colorado.

**Ford Focus**

67.    On or about June 26, 2013, Plaintiff purchased a new 2013 Ford Focus from Groove Ford, an authorized Ford dealer in Centennial, Colorado. Her vehicle was equipped with an optional PowerShift Transmission that cost her $1,095.00.

68.    Plaintiff purchased her vehicle primarily for personal, family, or household use.  Ford manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

69.    Passenger safety, vehicle performance, gas mileage, and reliability were all factors in Plaintiff's decision to purchase her vehicle.  Prior to purchasing her Class Vehicle, Plaintiff researched the vehicle on Ford's official

website and subsequently test drove the vehicle.  Had Ford disclosed its knowledge of the Transmission Defect, and the fact that it posed a safety concern, when Plaintiff purchased her 2013 Ford Focus, Plaintiff would have seen such disclosures and been aware of them.  Indeed, Ford's omissions were material to Plaintiff.  Like all members of the classes, Plaintiff would not have purchased her 2013 Ford Focus, or would not have paid the purchase price charged by Ford, had she known that the PowerShift Transmission is prone to premature internal wear and failure, that it suffers from transmission slips, bucking, kicking, jerking, harsh engagement, sudden acceleration, delay in downshifts, delayed acceleration, and difficulty stopping the vehicle.

70.     Within the first week after purchase, Plaintiff's transmission was shuddering, jerking, and hesitating to accelerate.  Although Plaintiff brought aforementioned issues to the attention of the service technicians at Groove Ford, she was informed by the technicians that the symptoms were "normal" and that she should drive the vehicle "hard" in order to reduce the shuddering and jerking.  However, Plaintiff continued to experience the same problems mentioned to Ford dealer.

71.     On or about August 7, 2013, with approximately 4,928 miles on the odometer, Plaintiff brought her vehicle to Groove Ford again complaining that her vehicle was shuddering, jerking, and hesitating to accelerate.  The service technician performed a multi-point inspection and reprogrammed the vehicle's Transmission Control Module.  Plaintiff continued to experience the same problems complained about to Ford dealer.

72.     Additionally, on or about April 10, 2015, with approximately 22,010 miles on the odometer, Plaintiff brought her vehicle to Groove Ford complaining that her vehicle's transmission exhibits harsh shifting and "feels like it's going to die."  Following inspection, the Ford service technician reprogrammed the vehicle's Transmission Control Module.

73.     Additionally, on or about September 1, 2015, with approximately 28,161 miles on the odometer, Plaintiff brought her vehicle Groove Ford complaining that her vehicle's transmission continued to exhibit shuddering, jerking, delayed acceleration, and complete failure to accelerate resulting in near-collisions.  The Ford service technician inspected the vehicle, verified Plaintiff's concerns; and performed repairs per Customer Satisfaction Program 14M02.

74.     Plaintiff's vehicle continues to exhibit all of the problems she had previously complained about to authorized Ford dealer.

75.     Ford's authorized dealership has failed to adequately repair Plaintiff's vehicle.  Despite these repair attempts by Ford and its dealers, Plaintiff's transmission continues to shift erratically, and cause bucking, kicking, jerking, harsh engagement, delayed acceleration, lurching, erratic shifting, and a delay in downshifts.

76.     At all times, Plaintiff, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Plaintiff Lindsay Schmidt**

77.     Plaintiff Lindsay Schmidt is an Illinois resident, who resides in Elwood, Illinois.

**Ford Focus**

78.     On or about April 6, 2013, Plaintiff purchased a new 2013 Ford Focus from Joe Rizza Ford Porsche, an authorized Ford dealer in Orland Park, Illinois.  Her vehicle was equipped with an optional PowerShift Transmission that cost her $1,095.00.

79.     Plaintiff purchased her vehicle primarily for personal, family, or household use.  Ford manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

80.     Passenger safety, vehicle performance, gas mileage, and reliability

1    were all factors in Plaintiff's decision to purchase her vehicle.  Prior to

2    purchasing her Class Vehicle, Plaintiff researched the vehicle on Ford's official

3    website and subsequently test drove the vehicle.  Had Ford disclosed its

4    knowledge of the Transmission Defect, and the fact that it posed a safety

5    concern, when Plaintiff purchased her 2013 Ford Focus, Plaintiff would have

6    seen such disclosures and been aware of them.  Indeed, Ford's omissions were

7    material to Plaintiff.  Like all members of the classes, Plaintiff would not have

8    purchased her 2013 Ford Focus, or would not have paid the purchase price

9    charged by Ford, had she known that the PowerShift Transmission is prone to

10   premature internal wear and failure, that it suffers from transmission slips,

11   bucking, kicking, jerking, harsh engagement, sudden acceleration, delay in

12   downshifts, delayed acceleration, and difficulty stopping the vehicle.

13       81.    Within the first six months after purchase, Plaintiff's transmission

14   was shuddering, jerking, and exhibiting sudden acceleration and delayed

15   acceleration.

16       82.    Additionally, on or about April 17, 2014, with approximately 23,290

17   miles on the odometer, Plaintiff brought her vehicle again to Joe Rizza Ford

18   Porsche complaining that her vehicle's transmission continued to exhibit

19   shuddering, jerking, delayed acceleration, and complete failure to accelerate.

20   The Ford service technician inspected the vehicle and verified that Plaintiff's

21   concern "IS IN RELATION WITH DEFECTIVE CLUTCH DISK ASSEMBLY

22   OFF BALANCING CRANKSHAFT ROTATION, CAUSING VIBRATION."

23       83.    On or about August 21, 2014, with approximately 32,011 miles on

24   the odometer, Plaintiff brought her vehicle again to Joe Rizza Ford Porsche

25   complaining that her vehicle's transmission was hesitating to accelerate and

26   excessively shuddering.  The Ford service technician inspected Plaintiff's

27   vehicle, verified her concerns, and determined that the clutch assembly needed to

28   be replaced.  Following the vehicle's clutch assembly replacement, Plaintiff

1   continued to experience the same transmission issues described to Ford dealer.

2       84.   Additionally, on or about April 8, 2015, with approximately 50,053

3 miles on the odometer, Plaintiff brought her vehicle to Joe Rizza Ford Porsche

4 complaining that her vehicle continued to excessively shudder and hesitate to

5 accelerate during normal operation. The Ford service technician inspected

6 Plaintiff's vehicle and verified her concerns. He performed repairs including

7 recalibrating the TCM. However, Plaintiff continued to experience the same

8 transmission issues described to Ford dealer.

9       85.   Additionally, on or about July 13, 2015, with approximately 56,125

10 miles on the odometer, Plaintiff brought her vehicle to Joe Rizza Ford Porsche

11 complaining that her vehicle continued to hesitate to accelerate during normal

12 operation, most notably from complete stops. The Ford service technician

13 inspected Plaintiff's vehicle and verified her concerns. He performed repairs

14 including reprogramming the TCM and PCM.

15       86.   On or about September 3, 2015, with approximately 59,800 miles on

16 the odometer, Plaintiff brought her vehicle back to Joe Rizza Ford Porsche

17 complaining that her vehicle "died while driving," completely failed to start, and

18 would improperly state vehicle was in "drive" when actually in "park."

19 continued to excessively shudder and hesitate to accelerate during normal

20 operation. The Ford service technician inspected Plaintiff's vehicle, verified her

21 concerns, and performed repairs including replacing the TCM.

22       87.   Plaintiff's vehicle continues to exhibit all of the problems she had

23 previously complained about to authorized Ford dealer.

24       88.   Ford's authorized dealership has failed to adequately repair

25 Plaintiff's vehicle. Despite these repair attempts by Ford and its dealers,

26 Plaintiff's transmission continues to shift erratically, and cause bucking, kicking,

27 jerking, harsh engagement, delayed acceleration, lurching, erratic shifting, and a

28 delay in downshifts.

89.     At all times, Plaintiff, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Plaintiff Joshua Bruno**

90.     Plaintiff Joshua Bruno is a New Jersey resident, who resides in Hammonton, New Jersey.

**Ford Fiesta**

91.     On or about June 15, 2011, Plaintiff purchased a new 2011 Ford Fiesta from Holman Automotive, an authorized Ford dealer in Turnersville, New Jersey.  His vehicle was equipped with an optional PowerShift Transmission that cost him $1,095.00.

92.     Plaintiff purchased this vehicle primarily for personal, family, or household use.  Ford manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

93.     Passenger safety, vehicle performance, gas mileage, and reliability were all factors in Plaintiff's decision to purchase his vehicle.  Prior to purchasing his Class Vehicle, Plaintiff reviewed Ford's official website in order to research Fiesta options and features.  Had Ford disclosed its knowledge of the Transmission Defect, and the fact that it posed a safety concern, when Plaintiff purchased his 2011 Ford Fiesta, Plaintiff would have seen such disclosures and been aware of them.  Indeed, Ford's omissions were material to Plaintiff.  Like all members of the classes, Plaintiff would not have purchased his 2011 Ford Fiesta, or would not have paid the purchase price charged by Ford, had he known that the PowerShift Transmission is prone to premature internal wear and failure, that it suffers from transmission slips, bucking, kicking, jerking, harsh engagement, sudden acceleration, delay in downshifts, delayed acceleration, and difficulty stopping the vehicle.

94.     Just weeks after his purchase, Plaintiff's transmission was causing jerking, kicking, bucking, delayed acceleration and a delay in downshifts, most

notably when attempting to accelerate after coming to a complete stop.  The transmission was also erratically shifting in second and third gear.  Oftentimes, Plaintiff was unable to accelerate from the middle of an intersection prior to making a left turn, resulting in the vehicle nearly stalling.

95.     On or about August 31, 2011, with approximately 5,305 miles on the odometer, Plaintiff brought his vehicle to Holman Automotive, an authorized Ford dealer in Turnersville, New Jersey, complaining that the vehicle made a grinding noise when idling in park.  The service advisor at Ford performed a road test with Plaintiff in the vehicle and was unable to verify the concern, but requested to keep the vehicle overnight.  The service advisor performed a multipoint inspection, noted a "clunk" sound when the vehicle shifted from drive to park, but concluded that the noise was a "normal operating characteristic" of the vehicle.

96.     Within a couple of days of this dealership visit, all of the problems Plaintiff had complained of had returned.

97.     On or about February 16, 2012, with approximately 15,922 miles on the odometer, Plaintiff brought his vehicle back to Holman Automotive, complaining of a "clunking sound" when driving.  Plaintiff also complained that the vehicle was "banging" into gear when shifting and that when idle, the vehicle's RPM levels were exceedingly high.  The service advisor verified the concern and requested to keep the vehicle overnight.  The service provider performed TSB 11-9-2, reprogrammed the PCM (Powertrain Control Module) and the TCM (Transmission Control Module), performed a pinpoint test, and found the vehicle operating normally.

98.     Within a couple of days of this dealership visit, all of the problems Plaintiff had complained of had again returned.

99.     On or about February 22, 2012, with approximately 16,313 miles on the odometer, Plaintiff brought his vehicle back to Holman Automotive,

complaining of a squealing noise on turns and while accelerating.  Plaintiff also complained that the vehicle "revved" when decelerating and was difficult to start.  The service advisor requested to keep the vehicle overnight and found on a road test that he could not verify Plaintiff's concern.

100.   Within a couple of days of this dealership visit, all of the problems Plaintiff had complained of had again returned.

101.   On or about March 8, 2012, with approximately 17,436 miles on the odometer, Plaintiff brought his vehicle back to Holman Automotive, again complaining of a clunking sound when driving.  Plaintiff again also complained the vehicle was "banging" into gear when shifting and that when idle, the vehicle's RPMs raced exceedingly high.  The service advisor could not duplicate the concern and requested to keep the vehicle overnight.  He performed an electronic diagnostic test, checked modules for water entry, performed a transmission relearning process, and installed a data recorder on the vehicle.

102.   Within a couple of days of this dealership visit, all of the problems Plaintiff had complained of had again returned.

103.   On or about March 28, 2012, with approximately 17,523 miles on the odometer, Plaintiff brought his vehicle back to Holman Automotive, complaining of a loud squealing "school bus sound" when braking, a "hard bang" when accelerating, especially when accelerating after being stopped at a light, and having to replace brake fluid more than once.  The service advisor could not duplicate the concerns and requested to keep the vehicle overnight. The dealership removed the data recorder and found normal operations recorded. The service advisor reported "only normal PID readings;" however, upon inspection under the engine bay, the service advisor found brake fluid leaking from the master cylinder into the brake booster.  The master cylinder was repaired, the brake booster assembly was removed and replaced, and new brake fluid was added.  The vehicle was in the dealership's possession for repair until

April 03, 2012.

104.   Within a couple of days of this dealership visit, all of the problems Plaintiff had complained of had again returned.

105.   On or about September 26, 2013, with approximately 48,538 miles on the odometer, Plaintiff brought his vehicle back to Holman Automotive, complaining that the engine light and traction control uphill assist light were both on, that the vehicle had "no power," that there was a loss of power and ability to accelerate, and that the radio would cut out.  The service advisor verified the concern and requested to keep the vehicle overnight.  He reprogrammed the PCM (Powertrain Control Module) and the TCM (Transmission Control Module), performed an adaptive re-learn, performed a pinpoint test, and asked Plaintiff to return the vehicle for further diagnosis and repair.

106.   On or about September 30, 2013, with approximately 48,562 miles on the odometer, Plaintiff brought his vehicle back to Holman Automotive for further repair as requested by the dealership to replace certain transmission components in the vehicle (the flexplate, including 1 PLATE ASY – CONVERTER DRIVE, 6 BOLT- HEX.HEAD, 1 SENSOR – CRANKSHAFT POSITION, 1 PLATE – CYLINDER BLOCK REAR, 1 GASKET, 4 NUT – HEX, 2 BOLT, 2 NUT- HEX, 1 RETAINER – BEARING, 2 NUT – LOCKING, 1 SEAL, 8 NUT, 2 TRANSMISSION FLUID, and the flywheel).  The service advisor performed TSB 11-10-13, replaced the transmission flexplate, found the "crand" sensor was touching, found the check engine light on, replaced the fuel injector assembly, replaced the flywheel, cleaned the ABS module connector, added electrical grease, swapped No. 3 and No. 4 injectors, cleaned and secured all wire connections to injectors, cleared powertrain tables, and relearned the misfire table on a road test.

107.   Within a couple of days of this dealership visit, all of the problems

1  Plaintiff had complained of had again returned.

2      108.   On or about October 29, 2013, with approximately 49,857 miles on

3  the odometer, Plaintiff brought his vehicle back to Holman Automotive, again

4  complaining that the traction control uphill assist light and engine lights were

5  both and that the vehicle was shifting hard, banging into gear, and accelerating

6  inconsistently.  The service advisor verified the concern and requested to keep

7  the vehicle overnight.  He performed an electronic transmission diagnostic, and

8  found the vehicle shuddered on road tests, and proceeded to replace the clutch

9  assembly, keeping the vehicle from October 29 to November 13.  He performed

10  electronic transmission diagnostic tests, checked for oil leaks at the clutch, and

11  performed a transmission relearn through road tests.  The service provider also

12  replaced the clutch assembly.

13      109.   Within a couple of days of this dealership visit, all of the problems

14  Plaintiff had complained of had again returned.

15      110.   On or about June 11, 2014, with approximately 58,403 miles on the

16  odometer, Plaintiff brought his vehicle to Lilliston Ford in Vineland NJ ,

17  complaining of a hard shift in low gears and a loud roaring noise at speeds 40

18  miles per hour and above that grew louder the faster the car went.  The service

19  advisor requested to keep the vehicle overnight and performed a multipoint

20  inspection, during which he found that the two rear tires and front brake pads and

21  rotors needed replacing.  In addition, the service advisor noted that the vehicle

22  alignment required attention and replaced a ball bearing assembly in the front

23  wheel of the vehicle.

24      111.   Within a couple of days of this dealership visit, all of the problems

25  Plaintiff had complained of had again returned.

26      112.   On or about February 2015, with approximately 69,000 miles on the

27  odometer, the Plaintiff brought his vehicle to Lilliston Ford complaining of the

28  gears shifting poorly and the check engine light appearing.  The service provider

determined that Plaintiff's clutch assembly needed to once more be replaced, but as the parts were sold out, the repair was scheduled for an undetermined time in the near future. The dealership stated the clutches and computer parts needed to repair the car were nationally back ordered, and as soon as the parts arrived at the dealership location, the Plaintiff would receive notification to have the car repaired. Plaintiff was instructed to continue driving his vehicle with the defective transmission. That dealership did not provide a work order as there was no work to be done without the accompanying engine and transmission parts. At this point in time, Plaintiff received a letter from Ford informing owners that the vehicle's transmission warranty and transmission computer warranty were extended to 100,000 miles due to faulty components. Within a couple of days of this dealership visit, all of the problems Plaintiff had complained of had again returned.

113.   While awaiting the second clutch replacement (and third transmission repair, not including transmission reprograms), Plaintiff continued driving his vehicle with the defective transmission. On April 18, 2015, with approximately 72,000 on the odometer, Plaintiff crashed his vehicle into a road sign due to the vehicle's clutches not responding properly. Plaintiff reports that his vehicle was refusing to accelerate due to the clutches "not catching" and "when they finally did, my car caught gravel as the tires spun faster than they normally would have, and I hit a road sign." The police report reads "D1 stated that he was turning left and slid on gravel which caused him to go off the roadway and strike the sign. Investigation showed that D1 accelerated at a high rate of speed causing his tires to lose traction which caused him to slide to the right and strike the sign."

114.   On or about May 26, 2015, with approximately 74,301 miles on the odometer, the Plaintiff brought his vehicle back to Lilliston Ford to complete the clutch assembly replacement. Faulty clutches as well as computer parts were

CLASS ACTION COMPLAINT

repaired under Ford Motor Company repair order 14M01 and 14M02.  The dealership performed these repairs in 2 business days.

115.   Within a couple of days of this dealership visit, all of the problems the Plaintiff had complained of had again returned.

116.   On or about September 3, 2015, with approximately 80,165 miles on the odometer, the Plaintiff brought his vehicle back to Lilliston Ford to have his car's computer updated to read transmission faults as the original computer programming was defective.  The dealership reprogrammed the PCM and TCM of the vehicle.  This was done under repair order 15B22.  A multipoint inspection was also performed, revealing the vehicle to be in excellent health otherwise.

117.   Within a couple of days of this dealership visit, all of the transmission problems the Plaintiff had complained of had again returned.

118.   Ford's authorized dealerships have failed to adequately repair Plaintiff's vehicle.  Despite these repair attempts by Ford and its dealers, Plaintiff's transmission continue to shift erratically and sluggishly, and cause bucking, kicking, jerking, harsh engagement, delayed acceleration, lurching, erratic shifting, and a delay in downshifts, most notably when trying to accelerate after coming to a complete stop.  Further, the upshift continues to bog down like the vehicle might stall.

119.   At all times, Plaintiff, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which they were intended to be used.

**Plaintiff Virginia Otte**

120.   Plaintiff Virginia Otte is a New Jersey resident, who resides in Woodbridge, New Jersey.

**Ford Fiesta**

121.   On or about January 29, 2013, Plaintiff purchased a new 2013 Ford

Fiesta from Malouf Ford-Lincoln, Inc., an authorized Ford dealer in North Brunswick, New Jersey.  Her vehicle was equipped with an optional PowerShift Transmission that cost her $1,095.00.

122.   Plaintiff purchased her vehicle primarily for personal, family, or household use.  Ford manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

123.   Passenger safety, vehicle performance, gas mileage, and reliability were all factors in Plaintiff's decision to purchase her vehicle.  Prior to purchasing her Class Vehicle, Plaintiff test drove the vehicle.  Had Ford disclosed its knowledge of the Transmission Defect, and the fact that it posed a safety concern, when Plaintiff purchased her 2013 Ford Fiesta, Plaintiff would have seen such disclosures and been aware of them.  Indeed, Ford's omissions were material to Plaintiff.  Like all members of the classes, Plaintiff would not have purchased her 2013 Ford Fiesta, or would not have paid the purchase price charged by Ford, had she known that the PowerShift Transmission is prone to premature internal wear and failure, that it suffers from transmission slips, bucking, kicking, jerking, harsh engagement, sudden acceleration, delay in downshifts, delayed acceleration, and difficulty stopping the vehicle.

124.   Within the first month after purchase, Plaintiff's transmission was erratically and improperly shifting, most notably in low gears.

125.   On or about February 18, 2013, with approximately 816 miles on the odometer, Plaintiff brought her vehicle to Malouf Ford-Lincoln, Inc., complaining that the transmission was improperly shifting and that following an emergency stop, the RPMs shot up but the vehicle did not accelerate.  The service technician performed a multi-point inspection, but was unable to determine or repair the cause of Plaintiff's concern.  Plaintiff continued to experience the same improper shifting and delayed acceleration.

126.   Further, on or about December 21, 2013, Plaintiff was involved in

an auto accident while driving her 2013 Ford Fiesta.  Per the attending police officer's accident report, Plaintiff was attempting to make a left turn from stop when her vehicle failed to accelerate while crossing the intersection and was subsequently struck by another vehicle.

127.   Additionally, on or about October 27, 2104, with approximately 24,550 miles on the odometer, Plaintiff brought her vehicle to Malouf Ford-Lincoln, Inc. complaining that the vehicle's transmission shudders, jerks, and hesitates to accelerate from a stop.  The Ford service technician inspected the vehicle and verified Plaintiff's concerns.  He additionally inspected the transmission and noted that the clutch assembly had no oil.  He subsequently performed repairs including replacing the clutch and transmission seal assembly, and reprogrammed the Transmission and Powertrain control modules.

128.   Additionally, on or about July 28, 2015, with approximately 32,240 miles on the odometer, Plaintiff brought her vehicle to Malouf Ford-Lincoln, Inc. complaining that Plaintiff's transmission was causing jerking, bucking, delayed acceleration and a delay in downshifts, most notably when attempting to accelerate after coming to a complete stop.  The service technician performed a multi-point inspection, and was able to verify Plaintiff's concerns and perform repairs pursuant to TSB 15-0090.

129.   Plaintiff's vehicle continues to exhibit all of the problems she had previously complained about to authorized Ford dealer.

130.   Ford's authorized dealership has failed to adequately repair Plaintiff's vehicle.  Despite these repair attempts by Ford and its dealers, Plaintiff's transmission continues to shift erratically, and cause bucking, kicking, jerking, harsh engagement, delayed acceleration, lurching, erratic shifting, and a delay in downshifts, most notably when trying to accelerate after coming to a complete stop.

131.   At all times, Plaintiff, like all Class Members, has driven her vehicle

1  in a foreseeable manner and in the manner in which it was intended to be used.

2  **<u>Plaintiffs Jason and Jamie Porterfeld</u>**

3  132.   Plaintiffs Jason and Jamie Porterfeld are Pennsylvania citizens who

4  reside in Ruffs Dale, Pennsylvania.

5  ### Ford Focus

6  133.   On or about July 21, 2012, Plaintiffs purchased a new 2012 Ford

7  Focus from C. Harper Ford Kia Inc., an authorized Ford dealer in Belle Vernon,

8  Pennsylvania.  Their vehicle was equipped with an optional PowerShift

9  Transmission that cost them $1,095.00.

10  134.   Plaintiffs purchased this vehicle primarily for personal, family, or

11  household use.  Ford manufactured, sold, distributed, advertised, marketed, and

12  warranted the vehicle.

13  135.   Passenger safety, vehicle performance, gas mileage, and reliability

14  were all factors in Plaintiffs' decision to purchase their vehicle.  Prior to

15  purchasing their Class Vehicle, Plaintiffs reviewed Ford's official website in

16  order to research Focus options and features.  Had Ford disclosed its knowledge

17  of the Transmission Defect, and the fact that it posed a safety concern, when

18  Plaintiffs purchased their 2012 Ford Focus, Plaintiffs would have seen such

19  disclosures and been aware of them.  Indeed, Ford's omissions were material to

20  Plaintiffs.  Like all members of the classes, Plaintiffs would not have purchased

21  their 2012 Ford Focus, or would not have paid the purchase price charged by

22  Ford, had they known that the PowerShift Transmission is prone to premature

23  internal wear and failure, that it suffers from transmission slips, bucking,

24  kicking, jerking, harsh engagement, sudden acceleration, delay in downshifts,

25  delayed acceleration, and difficulty stopping the vehicle.

26  136.   Within the first month after purchase, Plaintiffs' transmission was

27  causing jerking, kicking, bucking, delayed acceleration and a delay in

28  downshifts, most notably when attempting to accelerate after coming to a

complete stop. The transmission was also was erratically shifting in second and third gear.  On many occasions, Plaintiffs have been unable to accelerate from the middle of an intersection when trying to make a left turn, with the vehicle nearly stalling.

137.   On or about August 23, 2013, with approximately 11,017 miles on the odometer, Plaintiffs brought their vehicle to C. Harper Auto Group, an authorized Ford dealer in Belle Vernon, Pennsylvania, complaining that their transmission shuddered when attempting to accelerate from a complete stop. The service provider performed a multi-point inspection, but was unable to determine or repair the cause of Plaintiffs' concern.

138.   Within a couple of days of this visit, Plaintiffs' vehicle was once again exhibiting all of the problems he had complained about.

139.   Ford's authorized dealership has failed to adequately repair Plaintiffs' vehicle.  Despite these repair attempts by Ford and its dealers, Plaintiffs' transmission continues to shift erratically, and cause bucking, kicking, jerking, harsh engagement, delayed acceleration, lurching, erratic shifting, and a delay in downshifts, most notably when trying to accelerate after coming to a complete stop.

140.   At all times, Plaintiffs, like all Class Members, have driven their vehicles in a foreseeable manner and in the manner in which they were intended to be used.

**Plaintiff Patricia Schwennker**

141.   Plaintiff Patricia Schwennker is a New York resident, who resides in Willsboro, New York.

142.   On or about July 2, 2012, Plaintiff purchased a new 2012 Ford Focus from Orange Motors, an authorized Ford dealer in Albany, New York. Her vehicle was equipped with an optional PowerShift Transmission that cost her $1,095.00.

143.   Plaintiff purchased her vehicle primarily for personal, family, or household use.  Ford manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

144.   Passenger safety, vehicle performance, gas mileage, and reliability were all factors in Plaintiff's decision to purchase her vehicle.  Prior to purchasing her Class Vehicle, Plaintiff researched the vehicle on Ford's official website and subsequently test drove the vehicle.  Had Ford disclosed its knowledge of the Transmission Defect, and the fact that it posed a safety concern, when Plaintiff purchased her 2012 Ford Focus, Plaintiff would have seen such disclosures and been aware of them.  Indeed, Ford's omissions were material to Plaintiff.  Like all members of the classes, Plaintiff would not have purchased her 2012 Ford Focus, or would not have paid the purchase price charged by Ford, had she known that the PowerShift Transmission is prone to premature internal wear and failure, that it suffers from transmission slips, bucking, kicking, jerking, harsh engagement, sudden acceleration, delay in downshifts, delayed acceleration, and difficulty stopping the vehicle.

145.   Within the first six months after purchase, Plaintiff experienced the transmission in her vehicle hesitating to shift, shuddering, and jerking, most notably in low gears.  In 2013, Plaintiff brought her vehicle to Orange Motors, with approximately 18,000 miles on the odometer, complaining that the transmission hesitated to shift and would shudder.  The Ford service technician inspected the vehicle and verified Plaintiff's concerns.  He reprogrammed the TCM and replaced the clutch assembly.  Plaintiff continues to experience the same problems described to Ford dealer despite several clutch assembly replacements and TCM reprograms.

146.   Ford's authorized dealership has failed to adequately repair Plaintiff's vehicle.  Despite these repair attempts by Ford and its dealers, Plaintiff's transmission continues to shift erratically, and cause bucking, kicking,

jerking, harsh engagement, delayed acceleration, lurching, erratic shifting, and a delay in downshifts.

147.   At all times, Plaintiff, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Plaintiff Abigail Fisher**

148.   Plaintiff Abigail Fisher is a Pennsylvania resident who resides in Allentown, Pennsylvania.

**Ford Focus**

149.   On or about December 26, 2013, Plaintiff purchased a used 2012 Ford Focus from Nazareth Ford, an authorized Ford dealer in Nazareth, Pennsylvania.  Her vehicle was equipped with an optional PowerShift Transmission that cost her $1,095.00

150.   Plaintiff purchased her vehicle primarily for personal, family, or household use.  Ford manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

151.   Passenger safety, vehicle performance, gas mileage, and reliability were all factors in Plaintiff's decision to purchase her vehicle.  Prior to purchasing her Class Vehicle, Plaintiff test drove the vehicle.  Had Ford disclosed its knowledge of the Transmission Defect, and the fact that it posed a safety concern, when Plaintiff purchased her 2012 Ford Focus, Plaintiff would have seen such disclosures and been aware of them.  Indeed, Ford's omissions were material to Plaintiff.  Like all members of the classes, Plaintiff would not have purchased her 2012 Ford Focus, or would not have paid the purchase price charged by Ford, had she known that the PowerShift Transmission is prone to premature internal wear and failure, that it suffers from transmission slips, bucking, kicking, jerking, harsh engagement, sudden acceleration, delay in downshifts, delayed acceleration, and difficulty stopping the vehicle.

152.   Within the first year of purchase, Plaintiff's transmission was

erratically and improperly shifting, most notably in low gears.

153.   On or about January 4, 2015, Plaintiff was involved in an auto accident while driving her 2012 Ford Focus.  Per the attending police officer's accident report, Plaintiff was backing out of a parking spot when her 2012 Ford Focus "rapidly accelerated forward," striking two parked cars.  The report indicates that Plaintiff told the officer that "she is not sure what happened with the vehicle that caused it to accelerate forward."  As a result of the unintended acceleration of her Ford Focus, Plaintiff has paid thousands of dollars in repair costs.

154.   Additionally, on or about September 18, 2015, with approximately 64,458 miles on the odometer, Plaintiff's transmission completely failed and she had the vehicle towed to Nazareth Ford complaining that Plaintiff's vehicle's "Check Engine" light was illuminated and its transmission had failed following RPMs "flaring" and gears hesitating to shift.  The service technician confirmed Plaintiff's concerns and replaced the vehicle's Transmission Control Module.

155.   Plaintiff's vehicle continues to exhibit all of the problems she had previously complained about to authorized Ford dealer including delayed acceleration, and erratic and improper shifting.

156.   Ford's authorized dealership has failed to adequately repair Plaintiff's vehicle.  Despite these repair attempts by Ford and its dealers, Plaintiff's transmission continues to shift erratically, and cause bucking, kicking, jerking, harsh engagement, delayed acceleration, lurching, erratic shifting, and a delay in downshifts, most notably when trying to accelerate after coming to a complete stop.

157.   At all times, Plaintiff, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Plaintiff Christi Groshong**

158.   Plaintiff Christi Groshong is an Oregon resident who resides in

Tillamook, Oregon.

**Ford Fiesta**

159.   On or about March 26, 2013, Plaintiff purchased a new 2013 Ford Fiesta from Damerow Ford, an authorized Ford dealer in Beaverton, Oregon. Her vehicle was equipped with an optional PowerShift Transmission that cost her $1,095.00

160.   Plaintiff purchased her vehicle primarily for personal, family, or household use.  Ford manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

161.   Passenger safety, vehicle performance, gas mileage, and reliability were all factors in Plaintiff's decision to purchase her vehicle.  Prior to purchasing her Class Vehicle, Plaintiff researched the vehicle on the Ford official website and test drove the vehicle.  Had Ford disclosed its knowledge of the Transmission Defect, and the fact that it posed a safety concern, when Plaintiff purchased her 2013 Ford Fiesta, Plaintiff would have seen such disclosures and been aware of them.  Indeed, Ford's omissions were material to Plaintiff.  Like all members of the classes, Plaintiff would not have purchased her 2013 Ford Fiesta, or would not have paid the purchase price charged by Ford, had she known that the PowerShift Transmission is prone to premature internal wear and failure, that it suffers from transmission slips, bucking, kicking, jerking, harsh engagement, sudden acceleration, delay in downshifts, delayed acceleration, and difficulty stopping the vehicle.

162.   Within the first month of purchase, Plaintiff's transmission was erratically and improperly shifting, most notably in low gears.

163.   On or about April 30, 2013, with approximately 965 miles on the odometer, Plaintiff began experiencing her vehicle's transmission grinding when turning and accelerating from stop and brought her vehicle to Damerow Ford. The Ford service technician inspected the vehicle but was unable to duplicate

1  Plaintiff's concerns or diagnose the problem at that time.  As such, no repairs

2  were performed.  Plaintiff continued to experience the transmission grinding.

3       164.   On or about August 28, 2013, with approximately 11,009 miles on

4  the odometer, Plaintiff brought her vehicle to Damerow Ford again complaining

5  of the transmission grinding on acceleration, while idling, and while turning.

6  Again, the Ford service technician inspected the vehicle but was unable to

7  diagnose and repair the problem.  Plaintiff continued to experience the problems

8  complained about to Ford dealer.

9       165.   On or about February 27, 2014, with approximately 30,426 miles on

10  the odometer, Plaintiff brought her vehicle to Damerow Ford.  The repair order

11  states Plaintiff complained that "TRANSMISSION IS REVVING VERY HIGH

12  BEFORE SHIFTING."  Following inspection, the Ford service technician

13  confirmed Plaintiff's concerns and performed repairs according to TSB 13-09-04

14  including installing new clutch.

15       166.   Further, on or about April 6, 2015, with approximately 45,509 miles

16  on the odometer, Plaintiff brought her vehicle to Tillamook Motor Company, an

17  authorized Ford dealer in Tillamook, Oregon, pursuant to recall 14E08.  The

18  service technician reprogrammed the Powertrain Control Module at that time.

19  Plaintiff continued to experience transmission issues including delayed

20  acceleration, shuddering, jerking, and loss of power.

21       167.   Further, on or about May 5, 2015, with approximately 46,559 miles

22  on the odometer, Plaintiff brought her vehicle to Tillamook Motor Company

23  complaining that the "ENGINE SEEMS TO LOSE POWER LIKE TRANS NOT

24  DOWNSHIFTING LIKE IT SHOULD" and "HAS EXCESSIVE SHUDDER."

25  The Ford service technician inspected the vehicle and confirmed Plaintiff's

26  concerns.  He performed repairs in accordance with TSB 15-0043 including

27  replacing TSM and input shaft seals, cleaning clutches, and reprogramming the

28  Powertrain Control Module and Transmission Control Module.

168.   Further, on or about May 15, 2015, with approximately 46,599 miles on the odometer, Plaintiff brought her vehicle to Tillamook Motor Company complaining that the vehicle would turn on but would not accelerate.  Following inspection, the service technician verified Plaintiff's concern, noting that he "REMOVE[D] TRANS, FOUND FLEX PLATE WITH DAMAGED TANG, HAIRLINE CRACK ALLOWED TANG TO BEND & NOT GIVE SIGNAL TO CKP SENSOR."  The Ford technician performed several repairs including replacing flywheel.

169.   Further, on or about May 22, 2015, with approximately 47,354 miles on the odometer, Plaintiff's vehicle's "Check Engine" indicator began flashing and she brought vehicle to Tillamook Motor Company.  The service technician inspected the vehicle, leaving Plaintiff without her vehicle or a temporary loaner vehicle for a month, and eventually reported that two fuel injector cylinders were misfiring.  The service report states that the technician replaced the ignition coils and performed repairs pursuant to "unique Fiesta procedure."

170.   On or about October 9, 2015, with approximately 51,042 miles on the odometer, Plaintiff brought her vehicle to Damerow Ford following the vehicle's transmission's continued and worsening shuddering, grinding, jerking, and failure to accelerate.  The Ford service technician inspected the vehicle, confirmed Plaintiff's concerns, and ordered parts for necessary repairs.  The service technician told Plaintiff that she would be notified when the parts arrived because they are backordered.  To date, Plaintiff has not been notified that parts are available for repairs required.

171.   Plaintiff's vehicle continues to exhibit all of the problems she had previously complained about to authorized Ford dealer including delayed acceleration, shuddering, jerking, grinding, and erratic and improper shifting.

172.   Ford's authorized dealership has failed to adequately repair Plaintiff's vehicle.  Despite these repair attempts by Ford and its dealers,

Plaintiff's transmission continues to shift erratically, and cause bucking, kicking, jerking, harsh engagement, delayed acceleration, lurching, erratic shifting, and a delay in downshifts, most notably when trying to accelerate after coming to a complete stop.

173.   At all times, Plaintiff, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Plaintiff Eric Dufour**

174.   Plaintiff Eric Dufour is a Washington resident, who resides in Olympia, Washington.

**Ford Focus**

175.   On or about September 8, 2014, Plaintiff purchased a new 2014 Ford Focus from Mullinax Ford of Olympia, an authorized Ford dealer in Olympia, Washington.  His vehicle was equipped with an optional PowerShift Transmission that cost him $1,095.00.

176.   Plaintiff purchased his vehicle primarily for personal, family, or household use.  Ford manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

177.   Passenger safety, vehicle performance, gas mileage, and reliability were all factors in Plaintiff's decision to purchase his vehicle.  Prior to purchasing his Class Vehicle, Plaintiff researched the vehicle on Ford's official website and subsequently test drove the vehicle.  Had Ford disclosed its knowledge of the Transmission Defect, and the fact that it posed a safety concern, when Plaintiff purchased his 2014 Ford Focus, Plaintiff would have seen such disclosures and been aware of them.  Indeed, Ford's omissions were material to Plaintiff.  Like all members of the classes, Plaintiff would not have purchased his 2014 Ford Focus, or would not have paid the purchase price charged by Ford, had he known that the PowerShift Transmission is prone to premature internal wear and failure, that it suffers from transmission slips,

bucking, kicking, jerking, harsh engagement, sudden acceleration, delay in downshifts, delayed acceleration, and difficulty stopping the vehicle.

178.   Within the first six months after purchase, Plaintiff's transmission was shuddering, jerking, and hesitating to accelerate.

179.   On or about June 29, 2015, with approximately 14,829 miles on the odometer, Plaintiff brought his vehicle to Mullinax Ford complaining that the vehicle was jerking, lurching, and shuddering during normal operation and would often fail to accelerate from complete stops.  The service technician performed a multi-point inspection and reprogrammed Plaintiff's vehicle's Transmission Control Module and Powertrain Control Module.  Plaintiff continued to experience the same problems.

180.   Additionally, on or about August 14, 2015, with approximately 18,350 miles on the odometer, Plaintiff brought his vehicle to Mullinax Ford complaining that Plaintiff's transmission was jerking and failing to accelerate from stops.  Additionally, Plaintiff complained that his vehicle would lurch forward and nearly hit pedestrians.  The service technician performed a multi-point inspection, and was able to verify Plaintiff's concerns.  He reprogrammed the vehicle's Transmission Control Module and Powertrain Control Module.

181.   Plaintiff's vehicle continues to exhibit all of the problems he had previously complained about to authorized Ford dealer.

182.   Ford's authorized dealership has failed to adequately repair Plaintiff's vehicle.  Despite these repair attempts by Ford and its dealers, Plaintiff's transmission continues to shift erratically, and cause bucking, kicking, jerking, harsh engagement, delayed acceleration, lurching, erratic shifting, and a delay in downshifts.

183.   At all times, Plaintiff, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.  **Defendant**

184.   Defendant Ford Motor Company is a corporation organized and in existence under the laws of the State of Delaware and registered with the California Department of Corporations to conduct business in California.  Ford Motor Company's Corporate Headquarters is located at 1 American Road, Dearborn, Michigan 48126.  Ford Motor Company designs and manufactures motor vehicles, parts, and other products for sale in the United States and throughout the world.  Ford Motor Company is the warrantor and distributor of the Class Vehicles in Arizona, California, Colorado, New Jersey, New York, Oregon, Pennsylvania and Washington.

185.   At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and/or selling automobiles and motor vehicle components in California and throughout the United States.

**JURISDICTION AND VENUE**

186.   This class action is brought pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) and based on 28 U.S.C. §§ 1441 and 1453.

187.   Venue properly lies in the United States District Court for the Central District of California pursuant to 28 U.S.C. §§ 84(a), 1391(a) and (c) and 1441(a).  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that plaintiffs would ordinarily expect to try them in one judicial proceeding.,

188.   In addition, Plaintiff Cusick resides in the County of Los Angeles California, within the Central District of California, and the acts, omissions, and one of the two contractual performances alleged herein took place in the County of Los Angeles, California.  Plaintiff Cusick's Declaration, as required under Cal. Civ. Code section 1780(d), which reflects that a substantial part of property

that is the subject of this action is situated in Los Angeles County, and that Defendant is doing business in Los Angeles County, California, is attached as Exhibit 1.

## FACTUAL ALLEGATIONS

189.   Since 2010, Ford has designed, manufactured, distributed, sold, and leased the Class Vehicles.  Ford has sold, directly or indirectly, through dealers and other retail outlets, hundreds of thousands of Class Vehicles equipped with the PowerShift Transmission in California.

190.   Ford's PowerShift Transmission, while occasionally referred to as an "automatic," is actually a set of computerized manual transmissions.  It lacks a torque converter, instead using two "dry" clutches to directly connect and disconnect the engine to and from the transmission.  Whereas other "automated manual" transmissions on the market use "wet" clutches bathed in oil, Ford's PowerShift Transmission clutches lack the oil pumps and other components of a wet clutch system, and instead operate "dry."

191.   The PowerShift Transmission is offered as the sole "automatic" option for both the Ford Fiesta and Ford Focus and is priced at $1,095.00.  The PowerShift Transmissions for both vehicles have the same design and components.

192.   On information and belief, Ford designed the Class Vehicles' computerized "automated manual" transmissions in an effort to meet heightened governmental and consumer expectations for fuel economy, performance, and efficiency.  Theoretically, such a transmission should have the convenience of an automatic transmission without sacrificing the fuel efficiency and shift speed of a manually-shifted vehicle.  In practice, however, Ford's PowerShift Transmission has been plagued by numerous problems and safety hazards, rendering the vehicle virtually inoperable.

193.   Dating back to at least 2010, Ford was aware of the defects of the

CLASS ACTION COMPLAINT

PowerShift Transmission.  Ford, however, failed and refused to disclose these known defects to consumers.  As a result of this failure, Plaintiffs and Class Members have been damaged.

**The Transmission Defect Poses an Unreasonable Safety Hazard**

194.   The Transmission Defect causes unsafe conditions in the Class Vehicles, including but not limited vehicles suddenly lurching forward, sudden loss of forward propulsion, and significant delays in acceleration.  These conditions present a safety hazard because they severely affect the driver's ability to control the vehicle's speed, acceleration, and deceleration.  Even more troubling, the Transmission Defect can cause the vehicle to fail to downshift and decelerate when the brakes are depressed.  As a result, Plaintiffs and Class Members have experienced their cars lurching forward into intersections at red lights due to the failure of their braking efforts to stop the car.

195.   Hundreds, if not thousands, of purchasers and lessees of the Class Vehicles have experienced problems with the transmission.  Complaints that owners and lessees filed with the NHTSA demonstrate that the defect is widespread and dangerous and that it manifests without warning.  The complaints also indicate Defendant's awareness of the problems with the transmission and how potentially dangerous the defective condition is for consumers.  The following is just a small sampling of the over 500 safety-related complaints describing the Transmission Defect (spelling and grammar mistakes remain as found in the original) (Safecar.gov, *Search for Complaints* (February 3, 2014), http://www-odi.nhtsa.dot.gov/complaints/):

///

///

**2011 Ford Fiesta NHTSA Complaints:**

a.  (2011 Ford Fiesta 9/25/2014) I BOUGHT THIS CAR IN JUNE 2011. RIGHT FROM THE BEGINNING IT HAS HAD A TRANSMISSION PROBLEM. THE CAR SHUDDERS WHEN TRYING TO ACCELERATE. SOMETIMES IT'S LIGHT SHUDDERING AND SOMETIMES IT'S VERY ROUGH WHERE THE WHOLE CAR IS JERKING. THERE HAVE BEEN SEVERAL INCIDENCES WHERE I WAS TURNING LEFT AND THOUGHT I HAD PLENTY OF TIME BUT THE CAR DECIDES TO SHUDDER AND I HAVE ALMOST BEEN HIT BY ANOTHER CAR. MY HUSBAND HAD A SUPER CLOSE CALL. SAME THING TURNING LEFT AND THE CAR WAS SHUDDERING SO BAD IT JUST WOULDN'T GO AND HE WAS ALMOST HIT BY A TRUCK. WE HAVE TAKEN THE CAR IN SEVERAL TIMES TO BE FIXED AND EACH TIME IT'S FIXED FOR A SHORT AMOUNT OF TIME BUT EVENTUALLY THE SHUDDERING COMES RIGHT BACK. I'VE BEEN TOLD ALL THE FIESTAS HAVE THIS PROBLEM AND EVEN IF THEY PUT A NEW TRANSMISSION IN THIS PROBLEM WILL HAPPEN BECAUSE OF THE WAY THE TRANSMISSIONS BEEN BUILT. I FEAR IT'S ONLY A MATTER OF TIME BEFORE SOMEONE IS SEVERELY HURT OR KILLED FROM THIS PROBLEM. I FEEL LIKE FORD NEEDS TO STEP UP AND FIX THIS PROBLEM BEFORE IT'S TOO LATE.

b.  (2011 Ford Fiesta 08/04/2014) I OWN A 2011 FORD FIESTA. THE CAR HAS LEFT ME STRANDED ON THE SIDE OF THE ROAD 4 TIMES. 3 OUT OF THE 4 TIMES I BROKE DOWN I WAS RIGHT IN THE MIDDLE OF RUSH HOUR TRAFFIC IN NEW ORLEANS! NOT GOOD! I COULD HAVE BEEN KILLED, OR KILLED SOMEONE ELSE. TWICE I'VE HAD TO WAIT ON THE SIDE OF THE INTERSTATE FOR 2.5 HOURS WAITING FOR A TOW TRUCK WHEN I WAS SUPPOSED TO PICK UP MY 11 YEAR OLD FROM CAMP. I'VE MISSED WORK, MY SON HAS BEEN STRANDED, AND I JUST DO NOT FEEL SAFE IN THIS CAR. IT'S BEEN IN THE SHOP 4 TIMES NOW AND THEY'VE WORKED ON IT 3 TIMES. THE FIRST TIME IT BROKE DOWN I BROUGHT IT TO FORD AND THEY KEPT IT FOR ONE DAY BUT THEY DIDN'T GET TO WORK ON IT BECAUSE I WAS HAVING PROBLEMS WITH MY EXTENDED WARRANTED, WHICH IS THROUGH NISSAN. THE 2ND TIME I WAS TOLD THE CLUTCH WENT OUT IN THE DUAL TRANSMISSION DUE TO TRANSMISSION FLUID LEAKING ON A COMPONENT IN THE CAR. THEY TOOK MY TRANSMISSION OUT, REPLACED THE CLUTCH, ACCIDENTALLY BUSTED OUT MY WINDSHIELD IN THE PROCESS, THEN GAVE THE CAR BACK. NOT TOO LONG AFTER I GOT IT BACK, IT BROKE DOWN AGAIN. THEY SAID IT WAS THE COMPUTER THAT OPERATES THE TRANSMISSION. THEY DID UPDATES ON THE COMPUTER AND GAVE IT BACK TO ME. THE VERY NEXT DAY IT BROKE DOWN AGAIN AND IS NOW

SITTING BACK AT FORD IN SLIDELL. AT THIS POINT I DON'T EVEN THINK THEY KNOW WHAT TO DO WITH IT. I THEN FILE A COMPLAINT WITH FORD AND THEY SAY THERE'S NOTHING THEY CAN DO? SO I'M JUST STUCK WITH THIS BROKEN CAR FROM FORD THAT IS ONLY A FEW YEARS OLD? MY SON WAS WITH ME ONE OF THE TIMES THAT I BROKE DOWN - THE POOR THING WAS SCARED HALF TO DEATH! I CAN'T KEEP MISSING WORK - WHAT AM I SUPPOSED TO DO? ALL I SEE ONLINE IS PEOPLE WITH LAWSUITS AGAINST FORD BECAUSE OF THE TRANSMISSION IN THESE THINGS... WHY ISN'T THIS A RECALL YET? IT IS DEFINITELY DANGEROUS!

c. (2011 Ford Fiesta 06/24/2014) MY 2011 FORD FIESTA TRANSMISSION HAS BEEN AN ISSUE FOR AWHILE NOW. I HAVE HAD THEM RESET THE SYSTEM AND ALSO REPLACE THE CLUTCH. HOWEVER, MY CAR STILL HAS ISSUES THE TRANSMISSION STICKS AND DOES NOT ALWAYS ACCELERATE WHEN I PRESS ON THE GUESS. YOU CAN HEAR AND FEEL THE ENGINE STICK AND SHUTTER. THE CAR IS MORE AND MORE FAILING TO ACCELERATE WHICH HAS CAUSED TO ME TO ALMOST GET INTO SEVERAL ACCIDENTS. THE SOLUTION I WAS TOLD BY FORD WAS THAT THERE IS NO TRUE FIX AND IT IS JUST SOMETHING THEY CAN NOT FIX. MY CAR IS BRAND NEW AND STILL UNDER WARRANTY. THAT TYPE OF ANSWER IS NOT ACCEPTABLE, ESPECIALLY WHEN I HAVE ALMOST BEEN IN SEVERAL ACCIDENTS BECAUSE OF MY CAR MALFUNCTIONING. I WANT THIS ISSUE RESOLVED FOR GOOD, I AM EXTREMELY CONCERNED FOR MY SAFETY IN MY CAR AND FEAR OF GETTING IN AN ACCIDENT OR SERIOUSLY INJURED DUE TO THIS ISSUE. *TR

d. (2011 Ford Fiesta 04/18/2014) I HAD A 2011 FORD FIESTA, I HAVE BEEN EXPERIENCING A JERKING/LUNGING MOTION WHEN THE TRANSMISSION DOWNSHIFTS FROM TIME TO TIME. I HAVE ALMOST BEEN IN AN ACCIDENT TWICE BECAUSE OF THIS WITH MY 8 YEAR OLD DAUGHTER AND GIRL SCOUTS IN THE CAR. I TOOK THE VEHICLE IN FOR SERVICE AND HAVE INFORMED THEIR SERVICE DEPT./MECHANIC OF THE ISSUE. THEY ASSURED ME THAT NOTHING WAS WRONG AND THE VEHICLES COMPUTER IS ADJUSTING TO HOW I DRIVE THE CAR AND THAT IS WHY IT IS DOING THIS. THEY REPLACED THE CLUTCH AND REPROGRAMMED MY CAR OVER FOUR TIMES? I HAVE DONE A LITTLE RESEARCH AND FOUND THIS WEBSITES AFTER WEBSITE WITH PEOPLE WITH OTHER COMPLAINTS SIMILAR TO MINE. I CALLED FORD MOTOR COMPANY AND FILED A FORMAL COMPLAINT. IT TOOK A WEEK FOR SOMEONE TO CALL BE BACK AND I WAS TOLD THE CAR WAS FINE. I TRIED TO CALL BACK, BUT YOU ONLY GET TO THE CALL CENTER AND NO FURTHER. I WAS REFUSED TO BE TRANSFERRED TO A MANAGER AND

WAS TOLD THAT WAS THAT?S THE WAY THE CAR WAS DESIGNED TO DRIVE. I WAS OFFERED A DISCOUNT THE X PLAN TO TRADE IN MY CAR FOR ANOTHER BUT THAT WOULD NOT HELP. WHEN DEALING WITH THE DEALERSHIP THE SERVICE MANAGER SAID I AM SORRY I CAN'T HELP YOU ANYMORE. WE GET AT LEAST 6 CALLS A DAY ABOUT THE SAME PROBLEM BUT UNTIL FORD DOES SOMETHING THERE IS NOTHING WE CAN DO. I WORK WITH THREE OTHER WOMEN THAT ALSO HAVE HAD THE SAME PROBLEM WITH THEIR CARS. TWO OF US HAD TO TRADE OUR CARS BECAUSE WE FELT SO UN-SAFE IN THE CARS. *TR

e.  (2011 Ford Fiesta 01/16/2013) NUMEROUS OCCASIONS WHILE ACCELERATING AND DECELERATING THE 2011 FORD FIESTA STARTED TO STALL, JERK AND BUCK LIKE A BRONCO. IT SEEMED AS THOUGH IT WAS NOT GETTING POWER TO THE TRANSMISSION OR DRIVE TRAIN MOMENTARILY. THIS HAS BEEN AN ONGOING OFF AND ON FOR ABOUT A YEAR. WE RECENTLY TOOK IT TO THE SUNRISE FORD DEALERSHIP, FORT PIERCE, FL, AND THE SERVICE REP CLAIMS THEY COULD NOT FIND ANYTHING MECHANICALLY WRONG. THIS VEHICLE IS USED TO TRANSPORT YOUNG CHILDREN AND ADULTS. I EXPECT THE FORD MANUFACTURER TO EITHER REMEDY THE ISSUE OR BUY THE VEHICLE BACK FOR WHAT WE PAID FOR IT!!! IT COULD CAUSE AN ACCIDENT BECAUSE WHEN IT BUCKS IT ALSO SLOWS DOWN IN 45-50MPH TRAFFIC, AND THE TRAFFIC IS BUMPER TO BUMPER AT TIMES AND WE COULD GET REAR ENDED!!! SOMETHING NEEDS TO BE DONE IMMEDIATELY. SHOULD I ALSO FIND AN ATTORNEY THAT WILL REPRESENT US SHOULD FORD MOTOR BE LIABLE??? *TR

f.  (2011 Ford Fiesta 10/31/2012) TL* THE CONTACT OWNS A 2011 FORD FIESTA. THE CONTACT STATED THAT WHILE TRAVELING 3 MPH THE VEHICLE ERRONEOUSLY ACCELERATED CAUSING ANOTHER VEHICLE TO CRASH INTO THE VEHICLE. THE DRIVER AND PASSENGER OF THE CONTACT'S VEHICLE SUFFERED WHIPLASH. THE VEHICLE WAS ABLE TO BE DRIVEN AWAY FROM THE SCENE. THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC WHERE IT WAS FOUND THAT THE TRANSMISSION HAD FAILED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS CONTACTED ABOUT THE ISSUE. THE FAILURE MILEAGE WAS UNAVAILABLE AND THE CURRENT MILEAGE WAS 42,000.

g.  (2011 Ford Fiesta 03/21/2011) TRANSMISSION UNEXPECTEDLY CHANGING GEARS OR SELECTING INCORRECT GEAR. SUDDEN LOSS OF POWER DUE TO TRANSMISSION REMAINING IN TOO HIGH A GEAR FOR ENGINE RPM'S. LAPSE IN GEAR SELECTION CAUSES

CLASS ACTION COMPLAINT

ERRATIC AND DANGEROUS ACCELERATION. DANGEROUS GEAR CHANGES CAUSE CAR TO BOTH SURGE AND STALL - DEPENDING UPON ENGINE RPM'S NOT CORRESPONDING TO CORRECT TRANSMISSION GEAR. *TR

**2012 Ford Fiesta NHTSA Complaints:**

a.  (2012 Ford Fiesta 10/09/2014) THE CAR MAKES GRINDING NOISES FROM TRANSMISSION AND WHEN PULLING OUT OF A PARKING LOT THE CAR STALLS I ALMOST GET HIT BY ANOTHER CAR. WHEN IN STOP AND GO TRAFFIC THE AT LUNGES FORWARD ALMOST HITTING ANOTHER CAR. AS OF TODAY CAR HAS BEEN IN SHOP 3 TIMES ON THIRD TIME THEY FIXED THE CLUTCH IT DID FONRLE FOR A FEW MONTHS NOW ITS DOING IT AGAIN AND THEY ARE CLAIMING ITS NORMAL. I'M AFRAID FOR MY SAFETY

b.  (2012 Ford Fiesta 08/21/2014) THIS IS AN ON-GOING ISSUE WITH THIS CAR. WHILE DRIVING AT LOWER SPEEDS OR WHILE TRYING TO ACCELERATE WHILE MERGING ONTO A HIGHWAY OR AT A TRAFFIC STOP THE CAR WILL SHUDDER, PAUSE, JERK FORWARD OR PAUSE. THERE HAVE BEEN SEVERAL INCIDENTS WHERE I HAVE NEARLY BEEN IN A COLLISION BECAUSE OF THIS CLUTCH PROBLEM. THE JERK REACTION OF THE ACCELERATOR HAS CAUSED THE MOST CLOSE CALLS, AS IT CAN HAPPEN WHILE DECELERATING AS WELL. I HAVE BROUGHT THIS ISSUE TO MY LOCAL DEALER'S ATTENTION  AND HAVE HAD IT IN THE SHOP FOR A TOTAL OF 3 WEEKS OR MORE WITHIN A 6 WEEK PERIOD RECENTLY. BOTH TIMES I WAS TOLD THE CLUTCH SYSTEM WAS RESET AND HAD TO RE-ADAPT TO MY DRIVING, ONLY TO HAVE THE PROBLEM START AGAIN WITHIN A DAY OR TWO UNEXPECTEDLY. I HAVE TO BRING MY CAR IN YET AGAIN FOR THIS SAME ISSUE.

c.  (2012 Ford Fiesta 12/07/2013) THE VEHICLE HAS SERIOUS TRANSMISSION ISSUES. IN LOW GEARS IT OFTEN LURCHES, SHAKES, AND STALL OUT AS IF IT'S GOING TO DROP THE GEAR. THERE IS A LOUD GRINDING/RATTLING SOUND WHEN THE CAR SHIFTS. IT FEELS VERY UNSAFE DRIVING IN STOP AND GO TRAFFIC OR IN CITY CONDITIONS. THE ISSUES WITH THE LURCHING GEARS AND DROPPED GEARS ALSO MAKE IT VERY DIFFICULT TO ACCELERATE QUICKLY. THIS MAKES MERGING ONTO A HIGHWAY UNSAFE. *TR

d.  (2012 Ford Fiesta 08/29/2013) THE TRANSMISSION IN MY 2012 FORD FIESTA SEEMS FAULTY. WHEN DRIVING THE CAR I DO NOT FEEL SAFE AND AT TIMES FEEL LIKE THE CAR "HAS A MIND OF ITS OWN". THERE ARE TIMES WHEN I TRY TO SLOW DOWN WHEN COMING TO A STOP LIGHT, ETC. AND THE CAR SURGES FORWARD AS THE

RPM DIAL SPIKES. THERE ARE OTHER TIMES WHEN TRYING TO CHANGE LANES OR PULL OUT OF THE STREET AND I NEED TO ACCELERATE QUICKLY THE CAR WILL NOT ACCELERATE AS I SHOULD, PUTTING ME IN THE PATH OF AN ONCOMING CAR. WHILE GOING A CONSISTENT SPEED ON A STRAIGHT ROAD THE CAR WILL JERK, AS IF I'M ADJUSTING A MANUAL TRANSMISSION. I'VE BROUGHT THE CAR TO FORD AND WAS TOLD THIS WAS "NORMAL" FOR THE CAR. IT SEEMS THAT MYSELF AND OTHERS ARE HAVING THIS ISSUE AND HOW IT HAS NOT BEEN DEEMED A SAFETY ISSUE WITH REPERCUSSION OF A RECALL IS BEYOND ME.

**2013 Ford Fiesta NHTSA Complaints:**

a.   (2013 Ford Fiesta 11/12/2014) THE CAR IS UNSAFE!!! ITS JERKS, SHAKES, ROLLS BACK, ACCELERATES ON ITS OWN AND THE TRANSMISSION MAKES WEIRD SOUNDS. A FEW DAYS AGO I TOOK IT IN BECAUSE IT WOULDN'T MOVE. THAT WAS THE SECOND TIME I HAD TAKEN IT IN FOR THAT ISSUE. I PICKED THE CAR UP MONDAY NIGHT AND TUESDAY IT WAS BACK IN THE SHOP. THE CAR STALLED IN MID TURN, ALMOST CAUSING ME TO GET INTO AN ACCIDENT. I AM NOW AFRAID TO DRIVE MY CAR. FORD KNOWS THE VEHICLE NEEDS TO BE RECALLED. INSTEAD OF DOING SO, THEY EXTEND THE WARRANTY IN A EFFORT TO MAKE CUSTOMERS HAPPY. IN THE MEANTIME THE PROBLEM ISN'T BEING SOLVED. THEY ARE WASTING COUNTLESS MANHOURS ON A SITUATION THAT ISN'T GOING AWAY.

b.   (2013 Ford Fiesta 09/18/2014) THE AUTOMATIC TRANSMISSION CAUSES PROBLEMS, AND FORD HAS WORKED ON IT MANY TIMES BUT HASN'T FIXED IT.THEY REPLACE THE 'CLUTCH' IN THE A/T AND REPROGRAM THE A/T, BUT THE PROBLEM REMAINS. THE TRANSMISSION/CLUTCH SLIPS; CAUSING THE CAR TO BRIEFLY LOSE POWER, THEN THE CAR LURCHES FORWARD WHEN THE A/T GRABS 3-4 SECONDS LATER. THE DANGER IS TWO-FOLD. A) WHEN YOU ARE STOPPED - FOR EXAMPLE - AT A 4-WAY STOP SIGN. YOU START TO GO, THE CAR LOOSES POWER AND SLOWS DOWN; SOMEONE ELSE THINKS YOU ARE YIELDING TO THEM AND THEY GO - MEANWHILE, THE FIESTA'S A/T GRABS AND SUDDENLY LURCHES FORWARD. THIS HAS CAUSED A NEAR CRASH SEVERAL TIMES. B) WHEN YOU ARE AT A STOP SIGN OR STOP LIGHT WITH A CAR BEHIND YOU. WHEN SAFE, YOU START TO MOVE FORWARD, THE CAR LOSES POWER AND SLOWS, AND THE CAR BEHIND YOU ENDS UP SLAMMING ON ITS BRAKES TO AVOID HITTING YOU. THIS HAS LED TO SOME NEAR MISSES. THE CAR IS UNSAFE. THANK YOU.

c.   (2013 Ford Fiesta 09/01/2014) I JUST BOUGHT A USED 2013

FORD FIESTA WITH ABOUT 43-44,000 MILES ON IT. I DROVE THE CAR OFF THE AUTHORIZED DEALER'S LOT ON YESTERDAY 8/31/2014. THE FIRST THING THAT I NOTICED WAS, AS I ENTERED THE HIGHWAY, THE CAR HAD TROUBLE GETTING UP TO SPEED WITH THE FLOW OF TRAFFIC. LATER ON THE SAME DAY PULLING OUT OF AN ESTABLISHMENT TO ENTER THE MAIN ROAD I PRESSED THE ACCELERATOR AND THE CAR JERKED AND ACTED LIKE IT WAS GOING TO STALL OUT. THEN IT LUNGED FORWARD INTO THE STREET! HAD THERE BEEN ONCOMING TRAFFIC, THIS COULD HAVE CAUSED AN ACCIDENT WITH ME AND MY FAMILY IN THE CAR! THE CAR HESITATES TO SHIFT GEARS CORRECTLY. THE RPM HAND REVS UP REAL HIGH ON A LIGHT PUSH ON THE GAS PEDAL AND DOESN'T COME DOWN EFFICIENTLY SO THE CAR JERKS WHEN IF FINALLY "CATCHES". I'VE HAD THIS CAR FOR ONE DAY! THIS IS A DANGER AND SOMETHING NEEDS TO BE DONE!

d.  (2013 Ford Fiesta 06/28/2014) MY 2013 FORD FIESTA SE HATCHBACK HAS ACCELERATION ISSUES I BELIEVE WILL CAUSE ME TO BE IN AN ACCIDENT. WHILE ACCELERATING INTO TRAFFIC THE VEHICLE CAN DOWN SHIFT OR "BOG DOWN", CAUSING ME TO LOSE ACCELERATION AND NEARLY CAUSING COLLISIONS. HAD IT NOT BEEN FOR THE DEFENSIVE DRIVING OF THE OTHER DRIVERS I DEFINITELY WOULD HAVE BEEN IN AN ACCIDENT

e.  (2013 Ford Fiesta 04/27/2014) I WAS STOPPED AT AN INTERSECTION WAITING ON TRAFFIC. FINALLY GOT A SMALL GAP AND HIT THE ACCELERATOR TO PROCEED INTO THE MIDDLE OF THE INTERSECTION, IT CLATTERED, THEN HESITATED AND WOULD NOT GO. AFTER ABOUT 3 SECONDS, WHICH FELT LIKE ETERNITY WHEN YOU CARS COMING TOWARDS YOU ON BOTH SIDES, IT FINALLY WENT. NO ACCIDENT, BUT WAY TOO CLOSE FOR MY COMFORT. I'VE HAD THIS CAR AT THE DEALERSHIP FOUR DIFFERENT TIMES FOR THIS SAME PROBLEM. THEY HAVE REPROGRAMMED THE TRANSMISSION EVERY TIME BUT IT STILL DOES THE SAME THING. ABOUT FOUR WEEKS AGO I WAS ON THE HIGHWAY AND THE CAR LOST COMPLETE POWER, ACTED AS IF IT WERE IN NEUTRAL. I HAVE FILED A COMPLAINT WITH FORD BUT THEY SAY IT IS WITHIN THEIR TOLERANCE. I BOUGHT THIS CAR FOR MY DAUGHTER BUT I AM AFRAID TO LET HER DRIVE WITHOUT ME. WHEN I FINALLY HAVE TO GIVE THIS CAR TO MY SIXTEEN YEAR OLD DAUGHTER, AND SHE LOSES HER LIFE BECAUSE OF THIS TRANSMISSION, IS WILL NOT BE TOLERABLE. *TR

f.  (2013 Ford Fiesta 03/27/2014) I PURCHASED MY 2013 FIESTA NEW OFF THE CAR LOT. IT WAS THE BIGGEST MISTAKE EVER. IT HAS BEEN IN THE REPAIR SHOP

TWICE FOR CLUTCH REPLACEMENTS. I WAS IN AN ACCIDENT THE LAST TIME BECAUSE IT HESITATED AND THEN TOOK OFF AND RAN IN TO THE CAR IN FRONT OF ME. FORD DIDN'T CARE ABOUT THE ACCIDENT. I HAD TO ARGUE WITH THEM TO GET A CAR TO DRIVE WHILE THEY FIXED MY CAR YET AGAIN. IT HAS AGAIN STARTED HESITATING AND THEN EXCELLING QUICKLY AND I DON'T KNOW WHAT TO DO ANYMORE. I BOUGHT A NEW CAR FOR RELIABILITY AND THIS IS FAR FROM RELIABLE. IT IS VERY VERY LOUD ALSO. *TR

g. (2013 Ford Fiesta 12/18/2013) TWO PROBLEMS: 1) WHEN TRYING TO ACCELERATE GENTLY FROM A STOP (AS IN A 4-WAY STOP SITUATION) THE VEHICLE ENGAGES VIOLENTLY AND SURGES FORWARD. I HAVE TO REACT QUICKLY IN THIS SITUATION AND SLAM ON THE BRAKES TO AVOID HITTING THE CAR IN FRONT OF ME. 2) WHEN TRYING TO ACCELERATE TO MERGE INTO TRAFFIC, THE CAR REVS (TRANSMISSION MAKES A LOT OF NOISE) BUT DOES NOT ACCELERATE. I HAVE HAD DANGEROUS SITUATIONS WHEN I COULD NOT ACCELERATE AND CARS WERE COMING UP ON ME QUICKLY. *TR

h. (2013 Ford Fiesta 11/16/2013) FROM A STOP SIGN MAKING A RIGHT TURN ONTO A HIGHWAY MY 2013 FORD FIESTA NOW DECIDES TO MAKE LOUD GRINDING NOISES FROM THE 6 SPEED AUTO TRANSMISSION WHEN ACCELERATE TO NORMAL HIGHWAY SPEED HESITATES AND ALMOST WAS REAR ENDED FROM THE VEHICLE BEHIND ME HAD TO QUICKLY PULL TO THE RIGHT OF THE ROAD BEFORE MERGING BACK ON THE HIGHWAY . HAVE TAKEN TO THE DEALER THREE TIMES FOR UNUSUAL TRANSMISSION SLIPPAGE, AND NOISES WAITING ON A BACK ORDER DUAL CLUTCH KIT PART ,1700 HUNDRED ON BACK ORDER WAS TOLD MAY TAKE UP TO 6 MONTHS FOR THIS PART TO ARRIVE. *TR

i. (2013 Ford Fiesta 10/09/2013) WHILE PULLING OUT OF A GAS STATION PARKING LOT INTO TRAFFIC THE TRANSMISSION SPUTTERED AND PAUSED FOR ABOUT 2 SECONDS ALMOST CAUSING THE ON COMING TRAFFIC TO HIT MY CAR. THERE WAS ALMOST NO ROOM FOR THE ON COMING CAR TO GO AROUND ME. NEAR MISS FROM BEING HIT ON THE DRIVERS DOOR FROM THE FRONT OF THE ON COMING CAR. *TR

j. (2013 Ford Fiesta 09/21/2013) AT A GREEN LIGHT ABOUT TO TURN LEFT I STARTED MY TURN. M Y TRANSMISSION PAUSE BEFORE MAKING THE TURN. THE ON COMING CAR HAD TO SWERVE TO MISS ME AND ALMOST CRASHED INTO ANOTHER CAR. SINCE THERE WAS NO CONTACT ALL CARS CONTINUED WITH OUT STOPPING.

CLASS ACTION COMPLAINT

k.   (2013 Ford Fiesta 07/28/2013) I ALMOST DIED IN THIS CAR TODAY. I RENTED IT FOR MY TRIP IN MAUI. IT WAS PRACTICALLY NEW WITH ONLY 10,000 MILES ON IT, SO THERE SHOULD NOT HAVE BEEN ANYTHING WRONG, EVEN IF THE PEOPLE THAT RENTED IT BEFORE ME DROVE IT HORRIBLY. TODAY I DROVE IT INTO THE HILLS (UPCOUNTRY MAUI). I WAS ON A ROAD WITH A CLIFF ON THE LEFT SIDE AND A DRIVEWAY ON THE RIGHT. I PULLED INTO THE DRIVEWAY, WHICH WAS A HILL GOING UP, AND EVERYTHING WAS INITIALLY FINE, THE CAR WAS GOING UP THE HILL JUST FINE, BUT A LITTLE OVER HALFWAY UP THE HILL THE CAR STOPPED ACCELERATING/MOVING. I WAS PRESSING THE GAS PEDAL TO THE FLOOR BUT IT HAD NO RPMS AND THE CAR BEGAN ROLLING BACKWARDS. SUDDENLY, THE TRANSMISSION (?) KICKED IN AND THE CAR LURCHED FORWARD AT 20MPH. THANKFULLY I WAS ABLE TO CONTROL IT AND MAKE IT TO THE TOP OF THE HILL, WHERE THERE WAS A PARKING LOT. HAD THE TRANSMISSION NOT KICKED IN AT THAT SECOND, THE CAR WOULD HAVE ROLLED ALL THE WAY BACK DOWN THE DRIVEWAY AND OFF THE CLIFF. THERE IS ABSOLUTELY NO WAY THAT I WAS PRESSING THE BRAKE PEDAL OR NOT PRESSING THE GAS. I WAS GOING UP A HILL AND OBVIOUSLY DIDN'T WANT TO ROLL BACK, SO OF COURSE I WOULD HAVE MY FOOT PRESSED DOWN ON THE ACCELERATOR. THIS IS FURTHER EXHIBITED BY THE FACT THAT THE CAR SUDDENLY LURCHED FORWARD AFTER A FEW SECONDS OF NOT MOVING, SO I DEFINITELY HAD MY FOOT ON THE ACCELERATOR THE WHOLE TIME. I HAVE READ ONLINE HUNDREDS OF PEOPLE THAT HAVE ISSUES WITH THE CAR NOT ACCELERATING/MOVING WHILE PRESSING ON THE GAS, SO THIS IS NOT AN ISOLATED ISSUE. WHAT IF THIS HAPPENS TO SOMEONE ELSE WHO IS RIDING IT IN THE HILLS OR MOUNTAINS? PLEASE DO SOMETHING ABOUT THIS CAR BEFORE SOMEONE IS SERIOUSLY HURT. *TR

**2014 Ford Fiesta NHTSA Complaints:**

a.   (2014 Ford Fiesta 01/15/2015) BOUGHT CAR ON JUNE 1 2014. TRANSMISSION SHUTTERS (SLIPS) FROM 1ST TO 3RD GEAR. TRY TO ACCELERATE AND IT SHUTTERS (SLIPS) FROM GEAR TO GEAR. COULD BE A SAFETY ISSUE AS GOING INTO TRAFFIC OR A LIGHT IT HESITATES WHICH COULD LEAD TO AN ACCIDENT. AFTER READING ARTICLES ON THIS ISSUE WITH THE TRANSMISSION (FIESTA'S & FOCUS'S) THIS SHOULD BE LOOKED INTO AS A SAFETY ISSUE BY THE NHTSA. FORD SEEMS TO NOT KNOW HOW TO FIX CORRECTLY. ADJUST COMPUTER, PUT NEW CLUTCH PADS ON, ETC. SEEMS NO CLEAR FIX TO PROBLEM. I FEEL THIS SHOULD BE CONSIDERED FOR A RECALL.

b.  (2014 Ford Fiesta 12/31/2014) I HAVE BEEN TAKING OFF AFTER STOPPING AND THE TRANSMISSION OR FUEL INJECTION MISSES CAUSING THE VEHICLE TO NOT ENGAGE THE DRIVE TRAIN JUST RIGHT. THE VEHICLE HESITATES, LURCHES, AND SHUTTERS. THE VIBRATION IS BAD AND I'M WORRIED IF I TAKE OFF FROM A STOP LIGHT OR SIGN, THE VEHICLE DOES NOT ENGAGE THE DRIVE TRAIN, I MIGHT BE HIT BY ANOTHER VEHICLE BECAUSE I CANNOT GET THE VEHICLE OUT OF THE PATH OF TRAFFIC DUE TO THE HESITATION. THIS IS A VERY SERIOUS SAFETY ISSUE AND SOMETHING MUST BE DONE TO CORRECT THE PROBLEM.

c.  (2014 Ford Fiesta 11/11/2014) A COUPLE MONTHS AFTER BUYING MY NEW CAR, I NOTICED THE TRANSMISSION WOULD START TO SHUDDER AND/OR BUCK WHEN ACCELERATING AFTER A STOP. CONTACTED THE DEALERSHIP AND HAVE BROUGHT IT IN 3 TIMES WITH NO ONE AT THE DEALERSHIP BEING ABLE TO "RECREATE" THE PROBLEM AND THEREFORE THEY COULDN'T FIX IT. THEY ALSO SAID THAT BECAUSE OF THE TYPE OF TRANSMISSION, THE PROBLEMS I WAS DESCRIBING ARE TO BE EXPECTED. HOW COULD A COMPANY RELEASE A TRANSMISSION THAT IS "SUPPOSED" TO BUCK AND SHUDDER? PROBLEM HAS CONTINUED TO GET WORSE AND I HAVE NOW EXPERIENCED SEVERAL INCIDENTS THAT I FEEL ARE VERY DANGEROUS. ONE OCCURS WHEN I APPROACH A STOP AND I AM APPLYING THE BRAKES, THE CAR WILL REV UP AND ACCELERATE ON ITS OWN, ALMOST CAUSING ME TO GO INTO TRAFFIC. ANOTHER INCIDENT IS WHEN I AM AT A YIELD AND DON'T COME TO A COMPLETE STOP, THEN ACCELERATE TO MERGE WITH TRAFFIC, THE TRANSMISSION SKIPS/STUTTERS/SHUDDERS DELAYING MY ACCELERATION AND MAKING THE MERGE DANGEROUS. THE PROBLEM IS INTERMITTENT, AND DOES NOT OCCUR AT EVERY STOP/YIELD. I AM AFRAID TO DRIVE MY CAR BECAUSE I NEVER KNOW WHAT OR WHEN IT WILL HAPPEN AGAIN.

d.  (2014 Ford Fiesta 10/26/2014) WHEN WE BOUGHT THE VEHICLE THEY SAID THERE WOULD BE SOME ABNORMAL NOISES IN THE TRANSMISSION DURING BREAK IN (1000 MILES) AND IT SHOULD GO AWAY. THE NOISES DIDN'T START UNTIL AROUND 4500 MILES. ON JULY 4, 2014 WE TOOK A 600 MILE ROUND TRIP (MILEAGE AT THIS TIME IS 7200). AT APPROXIMATELY HALF WAY THROUGH THIS TRIP WE START SMELLING BURNT OIL. THE VEHICLE THEN STARTED TO SHUDDER AND SHACK WHILE ACCELERATING FROM FIRST TO SECOND AND SECOND TO THIRD GEARS AND DIDN'T STOP. TOOK THE VEHICLE TO THE DEALER AND THEY REPROGRAMED THE SOFTWARE AND SAID SOME SLIPPING IS NORMAL

OPERATION  FOR THIS TRASMISSION. THIS WORKED FOR THREE DAYS THEN IT WENT BACK TO SHUDDERING AND SHACKING BUT WORSE THAN BEFORE. 2 DAYS LATER WE ALMOST GOT HIT WHILE TRYING TO PULL OUT INTO TRAFFIC BECAUSE THE TRANSMISSION WOULD NOT SHIFT AND POWER WASN'T THERE.

e.    (2014 Ford Fiesta 08/01/2014) CAR JERKS AND SHAKES VERY HARD AT LOW AND HIGH SPEEDS. TAKES OFF BY ITSELF WITH A FAST JERK AND ROLLS BACKWARDS WHEN AT A COMPLETE STOP. CAR ACTUALLY HAS LOST POWER WHILE TRY TO EXCELLERATE ONTO A MAJOR HIGH WAY.I WAS ALMOST HIT BY A TRACTOR TRAILER DUE TO THIS ISSUE. I'M VERY SCARED TO DRIVE THIS CAR AND VERY MUCH REGRET MY VERY FIRST PURCHASE OF A BRAND NEW CAR.

f.    (2014 Ford Fiesta 07/20/2014) ISSUES WITH THIS VEHICLE BEGAN AS SOON AS WE GOT IT. CAR CONSTANTLY STUTTERS LIKE IT'S ABOUT TO STALL (WAS TOLD BY SALESMAN THAT IT WAS BECAUSE CAR WAS BRAND NEW AND ONCE WE "BROKE IT IN' THAT WOULD GO AWAY). IT HAS NOT. DOES NOT ACCELERATE WHEN IT SHOULD AND DOESN'T DECELERATE WHEN IT SHOULD, NO MATTER HOW HARD OR SOFT YOU PRESS THE PEDALS. CAR SEEMS TO HAVE A MIND OF IT'S OWN. LIKES TO ACCELERATE WHEN HAVE BRAKE PRESSED, HAVE ALMOST REAR-ENDED CARS IN FRONT BECAUSE OF IT'S LURCHING FORWARD. WHEN USING SPORT MODE, CAR WOULD NOT HAVE ANY MORE POWER, BUT ENGINE WOULD REDLINE. STRONG BURNING SMELL ALSO. ONCE CAR FINALLY GOT MOVING, IT WAS VERY DIFFICULT TO GET IT TO SLOW DOWN. YOU CAN PUSH BRAKE PEDAL TO THE FLOOR BUT CAR IS STILL GOING - AND FIGHTING YOU TO KEEP GOING. DEALER UPGRADED  SOFTWARE - WHICH SEEMED TO HELP FOR THE FIRST FEW DAYS - AND TOLD US NOT TO USE THE SPORT MODE ANYMORE, WHICH WE DO NOT. DEALER STATED ALL COMPLAINTS WERE NOT ISSUES, THAT IS HOW THE CAR WORKS DUE TO THE TYPE OF ENGINE IT HAS IN IT. FIRST TIME FORD BUYER, FIRST BRAND NEW CAR IN A VERY, VERY LONG TIME. CAR IS DRIVEN TO AND FROM WORK 56 MILES EVERYDAY, PLUS LEISURE. FEEL VERY INSECURE DRIVING CAR. CAR IS NOT SAFE AND FORD NEEDS TO BE PRESSURED  TO FIX THESE ISSUES OR STOP MAKING THESE TYPE OF ENGINES!

g.    (2014 Ford Fiesta 07/19/2014) TRANSMISSION IS VERY JERKY -CAR HAS A LOT OF HESITATION AFTER ACCELERATING FROM A LOW SPEED OR A STOP -SHUDDERING AND GRINDING NOISE WHEN STOPPING AND ACCELERATING WHEN I FIRST BOUGHT THE CAR THESE ISSUES WERE MINOR AND I WAS TOLD THEY WOULD GO AWAY ONCE THE CAR GOT USED TO MY STYLE OF DRIVING BUT NOW THEY HAVE BECOME MORE SEVERE AND HAPPENING

MORE FREQUENTLY MAKING THIS CAR A SAFETY ISSUE. WHEN CHANGING LANES AND MAKING TURNS THE CAR IS VERY UNPREDICTABLE AND MAY SOON CAUSE AN ACCIDENT. I HAVE TAKEN IT INTO FORD NUMEROUS TIMES AND AM ALWAYS TOLD THIS IS HOW THE CAR RUNS AND THESE ARE NORMAL FUNCTIONS FOR THE TRANSMISSION. I BELIEVE THESE CARS NEED TO BE RECALLED AND OFF THE ROAD BEFORE.

**2012 Ford Focus NHTSA Complaints:**

a.   (2012 Ford Focus 01/20/2015) I WAS DRIVING IN A RESIDENTIAL NEIGHBORHOOD AND APPROACHING A FOUR WAY STOP SO NOT GOING FAST. MY CAR STOPPED ACCELERATING AND THEN JERKED FORWARD CAUSING ME TO HAVE TO TURN OFF THE ROAD TO AVOID GOING THROUGH THE STOP SIGN. I INSTEAD HIT THE STOP SIGN. THE CAR HAS TRANSMISSION ISSUES THAT HAVE NOT YET BEEN RESOLVED.

b.   (2012 Ford Focus 04/09/2014) THIS IS THE FIRST OF 2 ACCIDENTS, BOTH CAUSED BY VEHICLE SURGING FORWARD AS I WAS PULLING INTO A PARKING SPACE. THIS FORM WOULD NOT ALLOW ME TO PUT BUT 1 ACCIDENT DATE. SECOND MORE SERIOUS ACCIDENT, DATE 02/08/2014, WILL BE LISTED SEPARATELY. AS I WAS TURNING INTO A PARKING SPACE WITH FOOT ON BRAKE THE CAR SUDDENLY LURCHED FORWARD MOUNTING THE CONCRETE PARKING STOP AND ENDED UP AGAINST A TREE IN THE MEDIAN. FLOORED THE BRAKE PEDAL BUT ENGINE CONTINUED  TO REV. DAMAGE TO UNDER SIDE OF CAR TOTALED $3494. FORD DEALERSHIP CHECKED THE COMPUTER  AND FOUND ENGINE OVERSPEED  CODE PO219. COULD NOT DUPLICATE INCIDENT AND GAVE CAR BACK TO ME. 3384 MILES LATER THE 2012 FORD FOCUS REPEATED THE LURCHING WITH MORE DAMAGE AND PERSONAL INJURY. *TR

c.   (2012 Ford Focus 01/21/2014) MY CAR HAS ALMOST GOTTEN ME IN 3 ACCIDENTS AND IT ROLLS BACK ON HILLS I WAS PULLING INTO A DRIVE WAY AND IT STARTED TO ROLL BACK THEN IT SLOWED DOWN AND THERE WAS A LOAD NOISE AND WE STARTED ROLLING BACKWARDS  IT WAS JUST A DRIVE WAY. THE CAR HAS ABSOLUTELY NO POWER AT ALL IT STUTTERS AND WHEN YOU ARE DRIVING IN BUSY PLACES AND YOUR CAR WONT PICK UP ENOUGH TON ENTER ON THE HIGHWAY OR FREEWAY ITS SCARY AND ITS UNSAFE IT WILL SHAKE THE WHOLE CAR WHEN IT PULLS BACK AND STUTTERS. IT IS AWFUL AND I WENT ON A 3 HOUR DRIVE TO GO ON VACATION I ACTUALLY RENTED A CAR INSTEAD OF TAKING MY BRAND NEW CAR THAT I

1   GOT TO LAST ME YEARS FRO NOW WAS THE PLAN IF IT
2   MAKES IT ANOTHER 1 YEAR I WILL BE SURPRISED
    VERY DANGEROUS  FORD. *TR

3   d.   (2012 Ford Focus 06/18/2012) WAS TOLD THIS CAR HAD
         "AUTOMATIC TRANSMISSION". AFTER A FEW HUNDRED
4        MILES ON IT, I NOTICED THE TRANSMISSION SHIFTED
         SPORADICALLY AND WITH NO PREDICTION. ENGINE
5        SHUDDERED, CAR LOST POWER AND WAS NOT SAFE TO
         DRIVE. THE KEY HERE IS NO PREDICTION  AS TO HOW
6        THE CAR WILL REACT WHEN UNDER ACCELERATION.
         TOOK TO DEALER AND WAS TOLD "THIS ISN'T AN
7        AUTOMATIC TRANSMISSION - IT'S A COMPUTER-
         CONTROLLED MANUAL THAT HAS TO LEARN HOW YOU
8        DRIVE". DEALER UPLOADED A COMPUTER UPDATE
         FROM FORD. THE NEXT HUNDRED MILES OF DRIVING
9        ALMOST CAUSED NUMEROUS ACCIDENTS DUE TO
         LACK OF ACCELERATION AND UNEVEN
10       PERFORMANCE. 6/4/2012 I TRIED TO MERGE INTO
         TRAFFIC AND CAR REFUSED TO SPEED UP. I ALMOST
11       CAUSED A MAJOR ACCIDENT, BUT NUMEROUS
         DRIVERS SLAMMED ON THEIR BRAKES AND/OR
12       SWERVED AND AVERTED MULTIPLE COLLISIONS.
         TOOK THE CAR TO DEALER 6/5/2012 AND TOLD THEM
13       WHAT HAPPENED. WAS TOLD BY HEAD TECH "IT JUST
         HAS TO GET USED TO HOW YOU DRIVE". I TOLD HIM
14       THERE WERE THREE DIFFERENT PEOPLE DRIVING THIS
         FOCUS. HE SAID WE CAN'T, BECAUSE THAT WOULD
15       JUST END UP TOTALLY "CONFUSING" THE COMPUTER.
         AS THE CAR IS TOO DANGEROUS  TO DRIVE, IT IS STILL
16       AT THE DEALER. MILES ON VEHICLE ARE UNDER 800.

17  e.   (2012 Ford Focus 03/09/2012) MY FORD FOCUS SEL 2012
         HAS BEEN EXPERIENCING SHUDDERING FEELINGS
18       WHEN ACCELERATING FROM STOP. IT FEELS AS IF THE
         TRANSMISSION IS ABOUT TO STALL AND THEN IT
19       KICKS BACK UP AND JOLTS MY CARS BACK AND
         FORTH FOR SEVERAL SECONDS BEFORE RESUMING
20       NORMAL SPEED AFTER 10 MPH. THESE SEVERAL
         SECONDS ARE VITAL WHEN YOU ARE DEALING WITH
21       FAST TRAFFIC IN CALIFORNIA OR ANYWHERE ELSE
         FOR THAT MATTER. THIS CREATED A DELAY IN THE
22       ACCELERATION TIME, ALMOST CAUSING AN ACCIDENT
         WITH ONCOMING TRAFFIC. I HAVE CONTACT SEVERAL
23       FORD OFFICIALS ABOUT THIS AND THEY KEEP SAYING
         THAT IT IS NORMAL AND THAT THERE IS A BREAK IN
24       PERIOD. WHY WAS I NOT MADE AWARE OF THIS WHEN
         I PURCHASED  THE CAR? THIS IS A SERIOUS SAFETY
25       HAZARD AND FORD IS JUST EXCUSING IT UNTIL MY
         WARRANTY PERIOD IS UP. TWO OF MY FRIENDS
26       BOUGHT THE SAME CAR AND IS EXPERIENCING THE
         SAME ISSUE. THIS IS NOT AN ISOLATED INCIDENT AND
27       I WOULD LIKE TO SEE PROPER ACTION FROM FORD TO
         ADDRESS THIS ISSUE PROFESSIONALLY. *TR
28

CLASS ACTION COMPLAINT

f.  (2012 Ford Focus 09/22/2011) THIS VEHICLE HAS SOME SCARY AND SOMETIMES DANGEROUS TRANSMISSION ISSUES. IT'S NOT LIKE A NORMAL AUTOMATIC WITH A TORQUE CONVERTER, SO SOME ROUGHNESS IS EXPECTED. BUT, THIS CAR OFTEN GRINDS GEARS, SLIPS, GRABS AND LUNGES, AND ALSO ROLLS BACK ON INCLINES. I HAVE NEARLY BEEN IN SEVERAL ACCIDENTS WHEN I HAVE TRIED TO ACCELERATE INTO AN INTERSECTION AND THE VEHICLE DOESN'T RESPOND TO THE ACCELERATOR BEING DEPRESSED COMPLETELY TO THE FLOOR. IT SOMETIMES ACTS AS IF YOU ARE TRYING TO START FROM A STOP IN 3RD OR 4TH GEAR. FORD MOTORS HAS CONTINUALLY SAID THESE PROBLEMS ARE NORMAL AND THE VEHICLE NEEDS SOME BREAK-IN TIME. WELL, THIS VEHICLE NOW HAS OVER 6,000 MILES. I DON'T THINK IT'S GOING TO GET BETTER. IF I GET INTO AN ACCIDENT BECAUSE OF THIS, THERE ARE GOING TO BE SOME SERIOUS PROBLEMS TO HANDLE WITH FORD. I KNOW I'M NOT ALONE IN THESE PROBLEMS. I HAVE BEEN ON FORUMS WITH MANY PEOPLE HAVING THE SAME ISSUES. *TR

**2013 Ford Focus NHTSA Complaints:**

a.  (2013 Ford Focus 01/16/2015) MY FORD FOCUS SHUDDERS WHEN ACCELERATING AND LURCH FORWARD WITHOUT WARNING WHEN I'M SLOWING DOWN OR ACCELERATING. I HAVE HAD IT REPAIRED ONCE AND NEED TO GO BACK AGAIN. HOW MANY TIMES DO I HAVE TO GO WITHOUT A CAR BECAUSE THE DEALERSHIP ONCE AGAIN HAS MY CAR IN FOR REPAIRS DUE TO A MANUFACTURER TRANSMISSION DEFECT. ALSO, WHAT PREMATURE INTERNAL WEAR IS THIS ALL CAUSING? WILL I NEED TO REPLACE PARTS BEFORE THEY WOULD NORMALLY NEED REPLACING OR FIXING?! I'M WORRIED THE CAR WILL BREAKDOWN OR THERE WILL BE A CRASH WHERE SOMEONE GETS SERIOUSLY HURT. IT HAS BEEN BROUGHT TO MY ATTENTION THAT FORD KNEW ABOUT THE DEFECT AND CONCEALED THE INFORMATION AND THERE ARE NUMEROUS LAW SUITS OUT THERE FOR THIS PARTICULAR ISSUE. I REALLY DON'T FEEL SAFE DRIVING THE CAR ANYMORE. I CAN'T REMEMBER THE SPECIFIC DATE OF THE FIRST INCIDENT BUT I CAN FIND OUT FROM THE DEALERSHIP IF NECESSARY.

b.  (2013 Ford Focus 10/06/2014) TOTAL LOSS OF THROTTLE, STALLING IN TRAFFIC, SHUDDERING AND ERRATIC SHIFTING WITH THE FORD POWERSHIFT TRANSMISSION. SINCE PURCHASING CAR NEW IN 2013, I HAD PROBLEMS WITH THE POWERSHIFT TRANSMISSION, INITIAL PROBLEMS WAS A NOISE THAT SOUNDED LIKE THE MUFFLER WAS DRAGGING THE

ROAD, PROBLEMS GOT WORSE AS MILEAGE INCREASED. RETURNED THE CAR TO SEVERAL DEALERS FOR DIAGNOSIS, WAS TOLD THAT THE TRANSMISSION IS OPERATING AS DESIGNED AND NO REPAIRS WERE ATTEMPTED. PROBLEM GOT WORSE AND I HAD EXPERIENCED TOTAL LOSS OF THROTTLE IN TRAFFIC ON SEVERAL OCCASIONS, CAR STALLED AND JERKED IN TRAFFIC CAUSING NECK TO SNAP BACK. AFTER REPEATED ATTEMPTS TO GET THE PROBLEM FIXED WITH TWO DIFFERENT FORD DEALERS, A CUSTOMER SATISFACTION LETTER CAME FROM FORD DETAILING ISSUES WITH POWERSHIFT TRANSMISSION. I HAD TO TAKE MY CAR INTO THE DEALER AGAIN, FOR DIAGNOSIS AND WAS TOLD THEY GOT IT THE TRANSMISSION TO FAIL THE THRESHOLDS AFTER 6 ATTEMPTS, WHICH WARRANTED REPLACEMENT OF THE CLUTCH PACK AND INTERNAL SEALS, SUPPOSEDLY A FAULTY DESIGN THAT ALLOWED OIL FROM THE GEARBOX TO LEAK INTO THE CLUTCH PACK CAUSING SLIPPAGE, NOISE AND ISSUES. FORD RETURNED THE CAR 5 DAYS LATER, ISSUES WENT AWAY FOR 3 WEEKS OR SO, AND HAVE STARTED TO REAPPEAR IN THE SAME FASHION AS WHEN THE CAR WAS PURCHASED NEW AND IS GETTING WORSE EACH DAY, WITH OVER 1000 MILES ON THE CAR SINCE SERVICE. AS OF TODAY I HAVE EXPERIENCED SHUDDERING AND TOTAL LOSS OF THROTTLE IN TRAFFIC, A FEW TIMES WERE DANGEROUS IN PULLING OUT IN FRONT OF ONCOMING TRAFFIC THE CAR COULD HAVE CAUSED ME TO GET INTO AN ACCIDENT, ALSO LUNGES IN SLOW MOVING TRAFFIC. I AM AFRAID TO LET MY WIFE DRIVE THE CAR DUE TO THE BEHAVIOR OF THE TRANSMISSION AND SEE AGAIN I WILL SOON HAVE TO RETURN TO ANOTHER DEALER (#3) FOR CORRECTION.

c.  (2013 Ford Focus 09/13/2014) I'VE REPORTED THIS ISSUE SEVERAL TIMES. IT IS GOING TO CAUSE AN ACCIDENT!! WHEN STOPPED AT A STOP LIGHT, OR STOP SIGN, THE CAR WANTS TO KEEP MOVING, EVEN THOUGH HEAVY BREAK PRESSURE IS BEING APPLIED. WHEN I AM AT A STOP LIGHT AND THE LIGHT TURNS GREEN TO MOVE FORWARD, THE CAR HESITATES TO MOVE, CAUSING THE VEHICLES BEHIND ME TO BLOW THEIR HORN! THERE IS NOTHING I CAN DO!! THIS CAR IS GOING TO CAUSE MYSELF OR OTHER OWNERS AN ACCIDENT WITH NO DOUBT IN MY MIND! THE HESITATION TO TAKE OFF WHEN I'M WANTING TO GET OUT OF THE WAY OF ONCOMING TRAFFIC, SCARES ME TO DEATH!!! SOMETHING NEEDS TO BE DONE BEFORE AN INNOCENT LIFE OR LIVES ARE LOST!!!

d.  (2013 Ford Focus 08/20/2014) THE CAR IS EXPERIENCING TRANSMISSION PROBLEMS. IT SHUDDERS AND BOGS DOWN AS I AM ACCELERATING, AND OFTEN LURCHES

FORWARD UNEXPECTEDLY. THE CAR MAKES A LOUD GRINDING NOISE WHEN SHIFTING THROUGH GEARS. THE PROBLEMS BEGAN IN LOW GEARS, BUT I AM NOW EXPERIENCING PROBLEMS AT ALL SPEEDS, INCLUDING LURCHING FORWARD. I HAVE TAKEN THE CAR BACK TO THE DEALERSHIP TWICE, ONLY FOR THEM TO TELL ME THIS IS A NORMAL OCCURRENCE. I AM AFRAID THE TRANSMISSION ISSUES WILL CAUSE AN ACCIDENT. I AM ALSO CONCERNED THAT THE GRINDING OF THE GEARS WILL CAUSE DAMAGE TO OTHER COMPONENTS OF MY VEHICLE.

e.  (2013 Ford Focus 02/13/2014) I OWN A 2013 FORD FOCUS HATCHBACK TITANIUM MODEL. PURCHASED THE CAR IN JANUARY 2013. CURRENTLY HAS 1100 MILES ON IT. CAR HAS A SIX-SPEED AUTOMATIC TRANSMISSION THAT FORD HAS DUBBED "POWERSHIFT". TRANSMISSION IS VERY JITTERY AT ALL SPEEDS WHEN SHIFTING GEARS WHILE ACCELERATING. IT IS ALSO HESITANT TO SHIFT GEARS AND PICK UP SPEED. IT SEEMS LIKE SOMETHING IS GOING TO BREAK INSIDE THE ENGINE AND THE CAR JERKS WHEN SHIFTING GEARS. FROM A STANDING STOP THE CAR WILL START TO ROLL BACK WHEN YOU LET OFF THE BRAKE AND STEP ON THE ACCELERATOR PEDAL. THIS IS AN ACCIDENT WAITING TO HAPPEN AND IS VERY DANGEROUS. *TR

**2014 Ford Focus NHTSA Complaints:**

a.  (2014 Ford Focus 12/29/2014) AT AROUND 24,000 MILES OUR 2014 FOCUS TRANSMISSION STARTING SHUTTERING DURING TAKE-OFF, MOST NOTABLY BETWEEN 1ST AND 2ND GEAR. IT IS UNPREDICTABLE AND SOMETIMES DANGEROUSLY HESITANT TO GET GOING. YOU HAD BETTER HOPE THE DAY YOU REALLY NEED THE CAR TO MOVE IT DOES; BUT NOT SURGE UNEXPECTEDLY. THE MOST FRUSTRATING POINT IS FORD SAYS IT'S NORMAL. NORMAL! I HAVE DRIVEN CARS WITH AUTOMATIC AND MANUAL TRANSMISSIONS FOR OVER 35 YEARS NEVER, HAS THIS BEEN NORMAL!!!

b.  (2014 Ford Focus 12/02/2014) ON AUGUST 27, 2014 I WAS IN THE PROCESS OF MAKING A RIGHT TURN FROM WEST BOUND ADAMS STREET TO NORTH BOUND 19TH AVENUE IN PHOENIX ARIZONA WHEN THE CAR STOPPED MOVING FORWARD. THE CAR ACTED AS IF IT WENT OUT OF GEAR; ENGINE WAS STILL RUNNING, BUT CAR WAS NOT MOVING FORWARD. THEN SUDDENLY THE CAR JERKED GOING FORWARD AT AN UNCONTROLLABLE SPEED. I WAS NOT ABLE TO CONTROL THE CAR AS IT DROVE INTO THE WRONG LANE OF TRAFFIC. I WAS FORTUNATE THERE WAS NOT ANOTHER CAR IN THAT OTHER LANE AT THAT TIME. I

FILED A COMPLAINT ABOUT THIS CAR PREVIOUSLY, PRIOR TO THIS INCIDENT OCCURRING. I HAD READ THAT THERE ARE A LOT OF OTHER COMPLAINTS REGARDING THE FORD FOCUS AND THERE IS A CURRENT CLASS ACTION LAW SUIT IN THE STATE OF CALIFORNIA. FORD IS ATTEMPTING TO HIDE THEIR DEFECTIVE BY ATTEMPTING TO REPROGRAM THE COMPUTER AND DENING ANY DEFECT. THE CAR HAS TRANSMISSION PROBLEMS THAT IS PLACING THE PUBLIC IN DANGER OF LIFE THREATENING AND OR PHYSICAL INJURY.

c.  (2014 Ford Focus 10/16/2014) WHEN I STOP AT A STOP SIGN OR LIGHT AND THEN TAKE OFF AGAIN MY CAR SHUDDERS AS I TRY TO START DRIVING. THEN, WHEN I TRY TO ACCELERATE IT LAGS, AND I HAVE TO PUT THE PEDDLE ALL THE WAY TO THE FLOOR BEFORE IT WILL ACCELERATE EVEN THE SLIGHTEST BIT. THIS OCCURS EVERY SINGLE TIME I DRIVE MY CAR. OFTEN WHEN I ATTEMPT TO DRIVE OFF AND I PUT MY FOOT DOWN ON THE GAS PEDAL, THE TRANSMISSION SLIPS MIDWAY THROUGH AND AFTER THE INITIAL TAKE OFF THE CAR STALLS. THIS HAS ALMOST CAUSED ME TO GET HIT MULTIPLE TIMES. THIS IS NOT SAFE. PLEASE DO SOMETHING ABOUT THIS BECAUSE IT IS A SERIOUS HAZARD.

d.  (2014 Ford Focus 09/27/2014) I BOUGHT MY CAR NEW BACK IN FEBURARY 2014. IT DOES ALL KINDS OF THINGS!! IT DOES NOT SHIFT RIGHT. IT JERKS, SLIPS, REVS HIGH. IF YOU NEED TO ACCELERATE IT DOESN'T EVER GEAR DOWN CORRECTLY, EITHER TOO MUCH OR NOT ENOUGH. IT HAS COMPLETELY STALLED AT INTERSECTIONS AND WOULD NOT MOVE. IT WOULD NOT EVEN REV UP. I HAD TO HAVE IT TOWED. IT HAS ACCELERATED INTO TRAFFIC AT A RED LIGHT, TWICE!! AND EACH TIME DID NOT HAVE BRAKES. MY CHILDREN WERE IN THE CAR AND IT WAS A NEAR MISS. MY CHILDREN COULD HAVE BEEN KILLED!! I HAVE HAD IT AT MY FORD DEALERSHIP 5 TIMES!!! YES 5 TIMES!!! EACH TIME IT RUNS FINE AND DOES NOT DO ANYTHING WRONG WHILE THEY ARE CHECKING IT OUT. THE MANAGER OF THE SERVICE DEPT STATES IT IS LIKE A SMARTPHONE AND ONCE YOU CUT IT OFF IT RESETS SO THIS IS PROBABLY WHY THEY CAN'T FIND ANYTHING WRONG WITH IT BY THE TIME THEY GET TO IT. I DO NOT FEEL SAFE DRIVING THIS CAR. BUT IT IS MY ONLY CAR. I DON'T KNOW WHAT TO DO. MY DEALERSHIP STATE THEY CANNOT DO ANYTHING. HELP!!!!!!!!!!!!!!!!!!!!!!!!!

e.  (2014 Ford Focus 09/02/2014) THE CAR HAS SEVERE TRANSMISSION ISSUES I HAVE ALMOST BEEN KILLED TWICE FOR BEING THROWN OUT INTO TRAFFIC ONCE AND TRYING TO PULL OUT ONTO A BUSY HIGHWAY.

STOPPING AT A STOP SIGN OR RED LIGHT IS A NIGHTMARE, MY CAR WILL STOP FINE, BUT WHEN YOU GO TO TAKE OFF IT JUMPS AND THE TRANSMISSION SLIPS LEAVING YOU BASICALLY SITTING IN THE MIDDLE OF THE HIGH WAY BARELY GETTING ANYWHERE THEN ALL OF A SUDDEN YOUR CAR WILL TAKE OFF AND MAKE YOU LOOSE CONTROL. THE RPMS ARE ALL MESSED UP IF I'M DRIVING DOWN THE ROAD THE RPM HAND JUST DANCES ALL OVER THE PLACE THIS CAR IS A DEATH TRAP!! THANKS FORD FOR RUINING MY LIFE AND STICKING ME WITH THIS TRUE LEMON OF A CAR....

196.   The Transmission Defect poses an unreasonable safety risk for Class Members and other drivers and pedestrians.  A vehicle's responsiveness to driver input, such as acceleration and deceleration, and the ability of a vehicle's transmission to perform properly are critical to a vehicle's safe operation.  A defect that causes one or more of these negative characteristics poses a safety hazard to the general public and increases the risk of automobile accidents.

**Ford Has Exclusive Knowledge of the Transmission Defect**

197.   Ford had superior and exclusive knowledge of the transmission defect, and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

198.   Plaintiffs are informed and believe and based thereon allege that before Plaintiffs purchased or leased their Class Vehicles, and since at least 2010, Ford knew about the Transmission Defect through sources not available to consumers, including: pre-release testing data; early consumer complaints about the Transmission Defect to Defendant's dealers who are their agents for vehicle repairs; warranty claim data related to the defect; aggregate data from Ford's dealers; consumer complaints to the NHTSA and resulting notice from NHTSA; dealership repair orders; testing conducted in response to owner or lessee complaints; TSBs applicable to the Class Vehicles; the existence of the defect in the substantially identical European and Australian model vehicles; and other

1   internal sources of aggregate information about the problem.

2       199.   Only Ford had access to its pre-release testing data, aggregate data

3   from Ford's dealers, testing conducted in response to owner or lessee complaints,

4   and other internal sources of aggregate information about the problem.  Ford did

5   not make this information available to customers, and customers had no way to

6   access it.

7       200.   Before offering the vehicle for sale in the United States, Ford

8   offered the same vehicles, equipped with a similar dual-clutch transmission, in

9   Europe and Australia.  Although the United States version utilizes dry-clutches

10  as opposed to the European and Australian version's wet-clutches, Ford

11  acknowledged in its own press release that the transmission offered for sale in

12  the United States is a "derivative" of the design from the European and

13  Australian models.[4]  European and Australian versions of the dual-clutch

14  transmission suffered from similar defects known to Ford as alleged herein.

15      201.   In addition to having years of testing, analysis, and feedback from

16  the prior European and Australian dual-clutch design, Ford also acknowledged in

17  its own press releases the extensive pre-release testing and computer-aided

18  modeling, simulation, and analysis it conducted before bringing the PowerShift

19  Transmission to the United States market.[5]

20      202.   Ford was also aware of the Transmission Defect through the

21  numerous complaints it received, both from consumers and from automotive

22  journalists, who roundly criticized the performance of the PowerShift

23  _____

   [4] *See* Autoblog.com, "Ford officially announces dual clutch PowerShift
24  gearbox for 2010," http://www.autoblog.com/2009/01/21/ford-officially-
   announces-dual-clutch-powershift-gearbox-for-201/ (last visited February 4,
25  2015).

   [5] *See* Ford.com, "Inside Info on the Ford PowerShift Six-speed Automatic
26  Transmission," https://social.ford.com/our-articles/cars/fiesta/inside-info-on-the-
   ford-powershift-six-speed-automatic-transmission/ (last visited: January 15,
27  2015).

28

Transmission.  Indeed, a July 15, 2011, *New York Times* review of the 2012 Ford Focus lambasted the PowerShift transmission's "jerks, pauses and lethargic acceleration."[6]  It also stated:

> So just as it seems that Ford has hammered a gee-whiz home run, we come to the automatic transmission, expected to be chosen by 90 percent of buyers.

> Dual-clutch designs are revered for sporty, fast shifts rivaling those of manual transmissions. **But Ford has calibrated the PowerShift to maximize fuel economy by seeking the highest gear possible as quickly as possible, which keeps the engine speed low.**

> The gearing is not a problem on the Interstate, but **can be aggravating on back roads or in stop-and-go traffic** . . . . Putting the shifter in the Sport position delays shifts but creates its own problem. Touching the brake while in Sport causes the gearbox to downshift.

203.   In that same article, Greg Burgess, a Ford engineer, admitted that Ford made "tradeoffs" in terms of drivability in order to "deliver something that is very, very fuel-efficient."

204.   The *New York Times* review by Christopher Jensen further condemned the transmission, stating:  "[i]n its effort to give the car exceptional fuel economy, Ford programmed the PowerShift dual-clutch transmission to change gears in odd and infuriating ways" and that "the logical explanation is that they [the Ford Engineers] were given a fuel economy target and no option but to meet it.  One might wonder why a top executive didn't step in to keep the transmission from reaching market . . . ."

205.   The alleged Transmission Defect was inherent in each Class Vehicles' PowerShift Transmission and was present in each Class Vehicles' PowerShift Transmission at the time of sale.

_____

[6] *See* NYTimes.com, "Such a Slick Package, but Gearbox Is a Drag," http://www.nytimes.com/2011/07/17/automobiles/autoreviews/ford-focus-is-slick-package-but-gearbox-is-a-drag.html (last visited: January 19, 2015).

206. The existence of the Transmission Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a vehicle that was equipped with a PowerShift transmission. Had Plaintiffs and other Class Members known that the Class Vehicles were equipped with defective transmissions, they would not have purchased or leased the Class Vehicles equipped with the PowerShift Transmissions or would have paid less for them.

207. Irrespective of all the aggregate information, both internal and external, that clearly provided Ford with knowledge that the PowerShift Transmission is dangerously defective, Ford has never disclosed to owners or prospective purchasers that there is a safety defect in the Class Vehicles. In fact, Ford intentionally and actively concealed the existence of a safety defect in the Class Vehicles.

208. Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle's transmission is safe, will function in a manner that will not pose a safety hazard, and is free from defects. Plaintiffs and Class Members further reasonably expect that Ford will not sell or lease vehicles with known safety defects, such as the Transmission Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Ford to fail to disclose the Transmission Defect to them and to continually deny the defect.

**Ford Has Actively Concealed the Transmission Defect**

209. While Ford has been fully aware of the Transmission Defect in the Class Vehicles, it actively concealed the existence and nature of the defect from Plaintiffs and Class Members at the time of purchase, lease, or repair and thereafter. Specifically, Ford failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

> (a) any and all known material defects or material nonconformity of the Class Vehicles, including the defects relating to the

1    PowerShift Transmission;

2    (b)    that the Class Vehicles, including their PowerShift

3    Transmissions, were not in good in working order, were

4    defective, and were not fit for their intended purposes; and

5    (c)    that the Class Vehicles and their PowerShift Transmissions

6    were defective, despite the fact that Ford learned of such

7    defects through alarming failure rates, customer complaints,

8    as well as other internal sources, as early as 2010.

9    210.   Ford further actively concealed the material facts that the

10   PowerShift transmission was not safe, that it would function in a manner that

11   would pose a safety hazard, and that it was defective.  Instead, Ford sold vehicles

12   with a known safety defect, and failed to disclose this defect to consumers when

13   Ford learned of it.

14   **Ford's "Communications Strategy"**

15   211.   In 2010, Ford knew of the Transmission Defect and began issuing

16   TSBs in an effort to address it.  But Ford never communicated the TSBs, or the

17   information they contained, directly to the class or prospective buyers.  Instead,

18   Ford prepared a separate series of sanitized documents for its customers intended

19   to induce them into believing that their kicking, bucking, sling-shotting (etc.)

20   vehicles were exhibiting "normal driving characteristics."

21   212.   Indeed, when Class Members with vehicles exhibiting the

22   Transmission Defect bring their vehicles to Ford dealerships, the dealership

23   oftentimes provide class members with a document entitled "PowerShift 6-Speed

24   Transmission Operating Characteristics."  Ford drafted this document and

25   provided it to its dealers to give to customers whose vehicles were exhibiting the

26   Transmission Defect, in an apparent attempt to induce customers into believing

27   the problems they were experiencing were "normal driving characteristics."

28   213.   Rather than disclosing that the PowerShift transmission was

1  defective, this document states that customers may experience "a trailer hitching

2  feel (or a slight bumping fee)" calling this "a normal characteristic of the dry

3  clutch-equipped manual transmission design."  Ford did not disclose in this letter

4  that the PowerShift transmission was defective, and did not disclose the

5  PowerShift transmission exhibits transmission slips, bucking, kicking, jerking,

6  premature internal wear, sudden acceleration, delay in downshifts, delayed

7  acceleration, difficulty stopping the vehicle, or transmission failure.

8        214.   In May of 2012, Ford issued a "Customer Satisfaction Program:

9  Program Number 12B37."  In a letter sent to 2012 Ford Focus drivers, Ford

10  indicated that drivers "may experience rough or jerky automatic transmission

11  shifts.  In addition, the vehicle may experience roll back when the driver is

12  transitioning from the brake pedal to the accelerator pedal while on a slight

13  incline."  Significantly, Ford did not issue a recall and did not warn drivers of the

14  safety risks associated with these known problems.  Ford's letter was highly

15  selective—despite Ford's knowledge of the following, Ford did *not* disclose that

16  the PowerShift transmission was defective, and did not disclose the PowerShift

17  transmission exhibits transmission slips, premature internal wear, sudden

18  acceleration, delay in downshifts, delayed acceleration, difficulty stopping the

19  vehicle, or transmission failure.

20        215.   August 2014, Ford issued a "Customer Satisfaction Program:

21  Program Number 14M01," telling the class that its vehicles "may . . . exhibit

22  excessive transmission shudder during light acceleration.  This condition may be

23  caused by fluid contamination of the clutch due to leaking transmission seals."

24  Significantly, Ford did not issue a recall and did not warn drivers of the safety

25  risks associated with these known problems.  Further, this campaign was only

26  disseminated to owners and not prospective buyers.  Ford merely offered more

27  ineffective "repairs" that do not actually fix the problem.   On information and

28  belief, owners who have had this program performed on their vehicles continued

to complain of the Transmission Defect as their vehicles were never repaired.

216.   Ford's "Customer Satisfaction Program: Program Number 14M01" letter was highly selective.  Despite Ford's knowledge of the following, Ford did *not* disclose that the PowerShift transmission was defective, and did not disclose the PowerShift transmission exhibits transmission slips, bucking, kicking, jerking, harsh engagement, premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration, difficulty stopping the vehicle, or transmission failure.

217.   To the contrary, in an apparent attempt to induce those customers suspecting that their transmission might be defective, Ford wrote in the letter that "slight vibrations may be felt when accelerating the vehicle from low speeds. These characteristics are normal for the PowerShift 6-speed Automatic Transmission."

218.   Ford then released, in February of 2015, "Customer Satisfaction Program: Program Number 14M02,"  informing the class that their Class Vehicles may suffer from symptoms of loss of transmission engagement while driving, no-start, or a lack of power.  Ford blamed these symptoms on failures in the Transmission Control Module ("TCM").  Still, Ford did not issue a recall for the repeatedly failing and dangerous PowerShift Transmission, and this campaign was only disseminated to owners, not prospective purchasers.  Ford merely offered more ineffective "repairs" that do not actually fix the problem. On information and belief, owners who have had this program performed on their vehicles continued to complain of the Transmission Defect as their vehicles were never repaired.

**Service Bulletins**

219.   Despite Ford's public insistence that these behavioral characteristics

of the PowerShift Transmission were normal, in 2010 and 2011, Ford issued several TSBs to only its dealers[7] in the United States acknowledging problems in the PowerShift Transmission.  For example, Ford's TSB from September 2010, covering the 2011 Ford Fiesta, informs dealers of "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or a check engine light with transmission control module (TCM) diagnostic trouble code…"

220.   Also, Ford's TSB released on January 1, 2011, covering the 2011 Fiesta with the PowerShift Transmission, informs dealers of problems with the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."

221.   Additionally, Ford's TSB from March 31, 2011, also covering the 2011 Ford Fiesta, informs dealers of problems where the PowerShift Transmission "exhibit[s] a rattle/grind noise in reverse only."

222.   Again, Ford issued two separate TSBs in May of 2011, both covering the Ford Fiesta vehicle.  These TSBs addressed problems with the PowerShift Transmission including "concerns in Drive or Reverse when shifting from Park to Drive or reverse, no engagement, delayed engagement, intermittent engagement, noise during engagement . . . ."

223.   On information and belief, another Ford TSB released in September 2011 advised dealers to reprogram the transmission computer if 2011 Fiesta owners complained about "hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop."

_____
[7] NHTSA makes some, but not all, service bulletins available online.

224.   Further, the 2012 Ford Focus was the subject of a Ford TSB issued in September 2011, which informed dealers of transmission problems including: "RPM flare on deceleration coming to a stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations at a stop, intermittent vehicle speed control inoperative, intermittent harsh engagement/shift…."

225.   In December of 2011, *Motor Trend* magazine characterized these efforts by Ford a "**stealth upgrade**" and that while [t]here's no official recall or service campaign . . . anybody who complains or requests an upgrade at the dealership can have their powertrain control computer re-flashed."

226.   On information and belief, the software upgrades outlined by the various TSBs as well as the repairs described in both Customer Satisfaction Programs issued by Ford were ineffective at addressing the Transmission Defect.

227.   When consumers present the Class Vehicles to an authorized Ford dealer for repair of the transmission, rather than repair the problem under warranty, Ford dealers either inform consumers that their vehicles are functioning properly, or conduct ineffective repairs or software updates that delay the manifestation of defect in an attempt not to pay for it under warranty.

228.   To this day, Ford still has not notified Plaintiffs and the Class Members that the Class Vehicles suffer from a systemic defect that causes the transmission to malfunction or the Ford is unable to repair the vehicles.

229.   On information and belief, Ford has caused Plaintiffs and Class Members to expend money at its dealerships to diagnose, repair, or replace the Class Vehicles' transmissions or related components, despite Ford's knowledge of the Transmission Defect.

230.   On information and belief, Class Members have been selling their vehicles at a monetary loss because of the Transmission Defect and their vehicles have diminished in value because of the Transmission Defect.

## CLASS ACTION ALLEGATIONS

231.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Plaintiff Classes pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

232.   The Class and Sub-Classes are defined as:

**Nationwide Class**:  All individuals in the United States who purchased or leased any 2011 through 2016 Ford Fiesta or 2012 through 2016 Ford Focus vehicles equipped with a PowerShift Transmission.

**Arizona Sub Class**:  All residents of the State of Arizona who purchased or leased any 2011 through 2016 Ford Fiesta or 2012 through 2016 Ford Focus vehicles equipped with a PowerShift Transmission.

**California Sub Class**:  All residents of the State of California who purchased or leased any 2011 through 2016 Ford Fiesta or 2012 through 2016 Ford Focus vehicles equipped with a PowerShift Transmission.

**CLRA Sub-Class**:  All members of the California Sub-Class who are "consumers" within the meaning of California Civil Code § 1761(d).

**Implied Warranty Sub-Class**:  All members of the Nationwide Class who purchased or leased their vehicles in the State of California.

**Colorado Sub Class**:  All residents of the State of Colorado who purchased or leased any 2011 through 2016 Ford Fiesta or 2012 through 2016 Ford Focus vehicles equipped with a PowerShift Transmission.

**Illinois Sub Class**: All residents of the State of Illinois who purchased or leased any 2011 through 2016 Ford Fiesta or 2012 through 2016 Ford Focus vehicles equipped with a PowerShift Transmission.

**New Jersey Sub-Class:** All residents of the State of New Jersey who purchased or leased any 2011 through 2016 Ford Fiesta or 2012 through 2016 Ford Focus vehicles equipped with a PowerShift Transmission.

**New York Sub-Class**:  All residents of the State of New York who purchased or leased any 2011 through 2016 Ford Fiesta or 2012 through 2016 Ford Focus vehicles equipped with a PowerShift Transmission.

1    **Pennsylvania Sub-Class**: All residents of the State of
2    Pennsylvania who purchased or leased any 2011
     through 2016 Ford Fiesta or 2012 through 2016 Ford
3    Focus vehicles equipped with a PowerShift
     Transmission.

4    **Oregon Sub Class**: All residents of the State of Oregon
     who purchased or leased any 2011 through 2016 Ford
5    Fiesta or 2012 through 2016 Ford Focus vehicles
     equipped with a PowerShift Transmission.

6
     **Washington Sub Class**: All residents of the State of
7    Washington who purchased or leased any 2011 through
     2016 Ford Fiesta or 2012 through 2016 Ford Focus
8    vehicles equipped with a PowerShift Transmission.

9        233.   Excluded from the Class and Sub-Classes are:  (1) Defendant, any

10   entity or division in which Defendant has a controlling interest, and their legal

11   representatives, officers, directors, assigns, and successors; (2) the Judge to

12   whom this case is assigned and the Judge's staff; (3) any Judge sitting in the

13   presiding court system who may hear an appeal of any judgment entered; and (4)

14   those persons who have suffered personal injuries as a result of the facts alleged

15   herein.  Plaintiff reserves the right to amend the Class and Sub-Class definitions

16   if discovery and further investigation reveal that the Class and Sub-Class should

17   be expanded or otherwise modified.

18       234.   There is a well-defined community of interest in the litigation and

19   each Sub-Class is readily ascertainable.

20       235.   <u>Numerosity</u>:  Although the exact number of Class Members is

21   uncertain and can only be ascertained through appropriate discovery, the number

22   is great enough such that joinder is impracticable.  The disposition of the claims

23   of these Class Members in a single action will provide substantial benefits to all

24   parties and to the Court.  The Class Members are readily identifiable from

25   information and records in Defendant's possession, custody, or control, as well

26   as from records kept by the Department of Motor Vehicles.

27       236.   <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the Class

28   in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle

designed, manufactured, and distributed by Ford, and equipped with a PowerShift Transmission.  The representative Plaintiffs, like all Class Members, have been damaged by Defendant's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective transmission.  Furthermore, the factual bases of Ford's misconduct are common to all Class Members and represent a common thread resulting in injury to all Class Members.

237.  <u>Commonality</u>:  There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting only individual Class Members.  These common legal and factual issues include the following:

(a) Whether Class Vehicles contain defects relating to the PowerShift Transmission;

(b) Whether the defects relating to the PowerShift Transmission constitute an unreasonable safety risk;

(c) Whether Defendant knew about the defects relating to the PowerShift Transmission and, if so, how long Defendant has known of the defect;

(d) Whether the defective nature of the PowerShift Transmission constitutes a material fact;

(e) Whether Defendant has a duty to disclose the defective nature of the PowerShift Transmission to Plaintiffs and Class Members;

(f) Whether Plaintiffs and the other Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;

(g) Whether Defendant knew or reasonably should have known of the defects relating to the PowerShift Transmission before it sold and leased Class Vehicles to Plaintiffs and Class

1                Members;

2         (h)     Whether Defendant should be declared financially responsible

3                for notifying all Class Members of the problems with the

4                Class Vehicles and for the costs and expenses of repairing and

5                replacing the defective PowerShift Transmission;

6         (i)     Whether Defendant is obligated to inform Class Members of

7                their right to seek reimbursement for having paid to diagnose,

8                repair, or replace their defective PowerShift Transmission;

9                and

10        (j)     Whether Defendant breached the implied warranty of

11                merchantability pursuant to the Song-Beverly Consumer

12                Warranty Act Act.

13       238.   <u>Adequate Representation</u>:  Plaintiffs will fairly and adequately

14  protect the interests of the Class Members.  Plaintiffs have retained attorneys

15  experienced in the prosecution of class actions, including consumer and product

16  defect class actions, and Plaintiffs intend to prosecute this action vigorously.

17       239.   <u>Predominance and Superiority</u>:  Plaintiffs and the Class Members

18  have all suffered and will continue to suffer harm and damages as a result of

19  Defendant's unlawful and wrongful conduct.  A class action is superior to other

20  available methods for the fair and efficient adjudication of the controversy.

21  Absent a class action, most Class Members would likely find the cost of

22  litigating their claims prohibitively high and would therefore have no effective

23  remedy at law.  Because of the relatively small size of the individual Class

24  Members' claims, it is likely that only a few Class Members could afford to seek

25  legal redress for Defendant's misconduct.  Absent a class action, Class Members

26  will continue to incur damages, and Defendant's misconduct will continue

27  without remedy.  Class treatment of common questions of law and fact would

28  also be a superior method to multiple individual actions or piecemeal litigation in

1   that class treatment will conserve the resources of the courts and the litigants,

2   and will promote consistency and efficiency of adjudication.

3   240.   In the alternative, this action is certifiable under the provisions of

4   Federal Rule of Civil Procedure 23(b)(1) and/or (b)(2) because:

5   (a)   The prosecution of separate actions by individual members of

6   the Class would create a risk of inconsistent or varying

7   adjudications with respect to individual members of the Class

8   which would establish incompatible standards of conduct for

9   Ford;

10   (b)   The prosecution of separate actions by individual members of

11   the Class would create a risk of adjudications as to them

12   which would, as a practical matter, be dispositive of the

13   interests of the other members of the Class not parties to the

14   adjudications, or substantially impair or impede their ability

15   to protect their interests; and

16   (c)   Ford has acted or refused to act on grounds generally

17   applicable to the Class, thereby making appropriate final

18   injunctive relief or corresponding declaratory relief with

19   respect to the Class as a whole and necessitating that any such

20   relief be extended to members of the Class on a mandatory,

21   class-wide basis.

22   241.   Plaintiffs are not aware of any difficulty which will be encountered

23   in the management of this litigation which should preclude its maintenance as a

24   class action.

25   **TOLLING OF THE STATUTES OF LIMITATIONS**

26   242.   Because the defect is undetectable until it manifests and Ford failed

27   to disclose or intentionally concealed the Transmission Defect, Plaintiffs and

28   Class Members were not reasonably able to discover the problem until after

purchasing the Class Vehicles, despite exercise of due diligence.

243.  Additionally, on information and belief, Ford instructed its authorized dealership employees and technicians to inform Class Members that the manifestations of the Transmission Defect in the PowerShift Transmission was normal, and therefore not a defect as alleged herein.

244.  Plaintiffs and the Class Members had no realistic ability to discern that the PowerShift Transmissions in Class Vehicles were defective.  Therefore, the discovery rule is applicable to the claims asserted by Plaintiffs and the Class Members.

245.  Plaintiffs are informed and believe and based thereon allege that Ford has known of the Transmission Defect since at least 2010 and has concealed from or failed to alert owners of the Class Vehicles of the defective nature of the PowerShift Transmissions.

246.  Any applicable statute of limitations has therefore been tolled by Defendant's knowledge, active concealment, and denial of the facts alleged herein.  Defendant is further estopped from relying on any statute of limitations because of its concealment of the Transmission Defect.

## FIRST CAUSE OF ACTION

### Violation of the Arizona Consumer Fraud Act – Ariz. Rev. Stat. 44-1521, et seq.

### (On Behalf of the Arizona Sub-Class)

247.  Plaintiffs hereby incorporate by reference all preceding allegations as though fully set forth herein.

248.  Plaintiff Tonya Patze (the "Arizona Plaintiff") asserts this claim on behalf of herself and the other members of the Arizona Sub-Class.

249.  Defendant knew of the Transmission Defect and the true nature of its PowerShift transmission system when it sold the Vehicles, but concealed all of that information from Arizona Plaintiff and other members of the Arizona

1  Sub-Class.

2       250.   By failing to disclose and by actively concealing the Transmission

3  Defect and the true nature of its PowerShift transmission system, by marketing

4  its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by

5  presenting itself as a reputable manufacturer that valued safety, cleanliness,

6  performance and efficiency, and stood behind its vehicles after they were sold,

7  Defendant knowingly and intentionally misrepresented and omitted material

8  facts and breached its duty not to do so.

9       251.   Arizona Plaintiff and other members of the Arizona Sub-Class

10  reasonably relied on Defendant's material misrepresentations and omissions in

11  its advertisements of the Class Vehicles and in the purchase of the Class

12  Vehicles.

13       252.   Defendant's use of deception, false promises, misrepresentations

14  and material omissions in connection with the sale and advertisement of its

15  services, violates the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-

16  1522(A).

17       253.   Had Arizona Plaintiff and members of the Arizona Sub-Class

18  known that the Class Vehicles would exhibit the Transmission Defect, they

19  would not have purchased the Class Vehicles or would have paid less for them.

20       254.   Arizona Plaintiff and other members of the Arizona Sub-Class

21  suffered injury in fact to a legally protected interest.  As a result of Defendant's

22  conduct, Arizona Plaintiff and Arizona Sub-Class members were harmed and

23  suffered actual damages in the form of the diminished value of their vehicles.

24       255.   As a result of Defendant's conduct,  Arizona Plaintiffs and Arizona

25  Sub-Class members were harmed and suffered actual damages as a result of

26  Defendant's misrepresentations and omissions with regard to their Class

27  Vehicles' transmissions because they purchased vehicles which do not perform

28  as advertised.

256.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Arizona Plaintiff and other members of the Arizona Sub-Class suffered and will continue to suffer actual damages.

**SECOND CAUSE OF ACTION**

**Violation of California's Consumer Legal Remedies Act –**

**Cal. Civ. Code § 1750, *et seq.***

(**On Behalf of the Nationwide Class or,**

**Alternatively, the California CLRA Sub-Class**)

257.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

258.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the CLRA Sub-Class.

259.   Defendant is a "person" as defined by California Civil Code § 1761(c).

260.   Plaintiffs and CLRA Sub-Class Members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family or household use.

261.   By failing to disclose and concealing the defective nature of the transmissions from Plaintiffs and prospective Class Members, Defendant violated California Civil Code § 1770(a), as it represented that the Class Vehicles and their transmissions had characteristics and benefits that they do not have, and represented that the Class Vehicles and their transmissions were of a particular standard, quality, or grade when they were of another.  *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

262.   Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

263.   Defendant knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

264.   As a result of their reliance on Defendant's omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Plaintiffs and the Class Members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

265.   Defendant was under a duty to Plaintiffs and the Class Members to disclose the defective nature of the transmissions and/or the associated repair costs because:

(a)   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' transmissions;

(b)   Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that their transmissions had a dangerous safety defect until it manifested; and

(c)   Defendant knew that Plaintiffs and the Class Members could not reasonably have been expected to learn of or discover the safety defect.

266.   In failing to disclose the defective nature of the transmissions, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

267.   The facts Defendant concealed from or did not disclose to Plaintiffs and the Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the

Class Vehicles or pay less.  Had Plaintiffs and other Class Members known that the Class Vehicles' transmissions were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

268.   Plaintiffs and the Class Members are reasonable consumers who do not expect the transmissions installed in their vehicles to exhibit transmission slips, kicking forward, jerking, premature internal wear, delayed acceleration, and/or difficulty in stopping the vehicle.  This is the reasonable and objective consumer expectation relating to vehicle transmissions.

269.   As a result of Defendant's conduct, Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles experienced and will continue to experience transmission slips, kicking forward, jerking, increased stopping times, premature internal wear, delayed acceleration, and, eventually, transmission failure.

270.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiffs and Class Members suffered and will continue to suffer actual damages.

271.   Plaintiffs and the Class are entitled to equitable relief.

272.   Plaintiffs provided Defendant with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a).  Defendant failed to provide appropriate relief for their violations of the CLRA.  Therefore Plaintiffs now seek monetary, compensatory, and punitive damages, in addition to the injunctive and equitable relief that they sought before.

## THIRD CAUSE OF ACTION

**Violation of California Business & Professions Code § 17200, *et seq.***

**(On Behalf of the Nationwide Class or, Alternatively, the California Sub-Class)**

273.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

274. Plaintiffs bring this cause of action on behalf of themselves and on behalf of the California Sub-Class.

275. As a result of their reliance on Defendant's omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Plaintiffs and the Class Members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

276. California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

277. Plaintiffs and the Class Members are reasonable consumers who do not expect their transmissions to exhibit transmission slips, kicking forward, jerking, increased stopping times, premature internal wear, delayed acceleration, and, eventually, transmission failure.

278. Defendant knew the Class Vehicles and their transmissions suffered from inherent defects, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

279. In failing to disclose the defects with the transmission, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so.

280. Defendant was under a duty to Plaintiffs and the Class Members to disclose the defective nature of the Class Vehicles and their transmissions:

> (a) Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' transmissions;
>
> (b) Defendant made partial disclosures about the quality of the

Class Vehicles without revealing the defective nature of the Class Vehicles and their transmissions; and

(c) Defendant actively concealed the defective nature of the Class Vehicles and their transmissions from Plaintiffs and the Class.

281. The facts Defendant concealed from or not disclosed to Plaintiffs and the Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Class Vehicles. Had Plaintiffs and other Class Members known that the Class Vehicles' transmissions were defective and posed a safety hazard, then Plaintiffs and the other Class Members would not have purchased or leased Class Vehicles equipped with transmissions, or would have paid less for them.

282. Defendant continued to conceal the defective nature of the Class Vehicles and their transmissions even after Class Members began to report problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem.

283. Defendant's conduct was and is likely to deceive consumers.

284. Defendant's acts, conduct and practices were unlawful, in that they constituted:

(a) Violations of the California Consumer Legal Remedies Act;

(b) Violations of the Song-Beverly Consumer Warranty Act; and

(c) Violations of the express warranty provisions of California Commercial Code section 2313.

285. By its conduct, Defendant has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

286. Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business, and were capable of deceiving a substantial portion of the purchasing public.

287. As a direct and proximate result of Defendant's unfair and deceptive

1  practices, Plaintiffs and the Class have suffered and will continue to suffer actual
2  damages.

3      288.   Defendant has been unjustly enriched and should be required to
4  make restitution to Plaintiffs and the Class pursuant to §§ 17203 and 17204 of
5  the Business & Professions Code.

6  **FOURTH CAUSE OF ACTION**
7  **Breach of Implied Warranty Pursuant to Song-Beverly**
8  **Consumer Warranty Act – Cal. Civ. Code §§ 1792 and 1791.1, *et seq.***
9  (**On Behalf of the Nationwide Class or,**
10  **Alternatively, the California Implied Warranty Sub-Class**)

11      289.   Plaintiffs incorporate by reference the allegations contained in the
12  preceding paragraphs of this Complaint.

13      290.   Plaintiffs bring this cause of action against Defendant on behalf of
14  themselves and on behalf of the members of the Implied Warranty Sub-Class.

15      291.   Defendant was at all relevant times the manufacturer, distributor,
16  warrantor, and/or seller of the Class Vehicles.  Defendant knew or had reason to
17  know of the specific use for which the Class Vehicles were purchased or leased.

18      292.   Defendant provided Plaintiffs and Class Members with an implied
19  warranty that the Class Vehicles and their components and parts are
20  merchantable and fit for the ordinary purposes for which they were sold.
21  However, the Class Vehicles are not fit for their ordinary purpose of providing
22  reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles
23  and their transmissions suffered from an inherent defect at the time of sale and
24  thereafter are not fit for their particular purpose of providing safe and reliable
25  transportation.

26      293.   Defendant impliedly warranted that the Class Vehicles were of
27  merchantable quality and fit for such use.  This implied warranty included,
28  among other things:  (i) a warranty that the Class Vehicles and their

transmissions were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

294.   Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their transmissions.

295.   As a result of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Plaintiffs and the Class Members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

296.   Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## FIFTH CAUSE OF ACTION

### Breach of Express Warranty – Cal. Comm. Code § 2313

### (On Behalf of the California Sub-Class)

297.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

298.   Plaintiff Cusick brings this cause of action on behalf of herself and on behalf of the California Sub-Class.

299.    As a result of Defendant's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable

loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Plaintiff and the Class Members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

300.  Defendant provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.  Accordingly, Defendant's express warranty is an express warranty under California law.

301.  Defendant manufactured and/or installed the transmission and its component parts in the Class Vehicles and the transmission and its component parts are covered by the express warranty.

302.  Ford provided all purchasers and lessees of the Class Vehicles with a New Vehicle "Bumper to Bumper" Limited Warranty and a Powertrain Limited Warranty with the purchase or lease of the Class Vehicles.  In this Bumper to Bumper Limited Warranty, Ford expressly warranted that its dealers would "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" if the vehicle is properly operated and maintained and was taken to a Ford dealership for a warranty repair during the warranty period.  Under this "Bumper to Bumper Coverage," Ford promised to cover "all parts on [the] vehicle" "for three years – unless you drive more than 36,000 miles before three years elapse. In that case, your coverage ends at 36,000 miles."

303.  Furthermore, under the Powertrain Limited Warranty, Ford expressly warranted that it would cover listed powertrain components under its Powertrain Limited Warranty, including transmission components including the "Transmission: all internal parts, clutch cover, seals and gaskets, torque converter, transfer case (including all internal parts), transmission case,

transmission mounts" "for five years or 60,000 miles, whichever occurs first."

304.   On information and belief, Defendant breached the express warranty by:

      a.    Extending a 3 year/36,000 mile Bumper to Bumper Limited Warranty and 5 year/60,000 mile Powertrain Limited Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship, including the subject transmission, at no cost to the owner or lessee;

      b.    Selling and leasing Class Vehicles with transmissions that were defective in material and workmanship, requiring repair or replacement within the warranty period;

      c.    Refusing to honor the express warranty by repairing or replacing, free of charge, the transmission or any of its component parts or programming and instead charging for repair and replacement parts; and

      d.    Purporting to repair the transmission and its component parts by replacing the defective transmission components with the same defective components and/or instituting temporary fixes, on information and belief, to ensure that the Transmission Defect manifests outside of the Class Vehicles' express warranty period.

305.   Plaintiff was not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile.  Defendant was also on notice of the defect from the complaints and service requests it received from Class Members, from repairs and/or replacements of the transmission or a component thereof, and through other internal sources.

306.   As a direct and proximate cause of Defendant's breach, Plaintiff and the other Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease.  Additionally, Plaintiff and the other Class Members either have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

307.   Additionally, Ford breached the express warranty by performing illusory repairs.  Rather than repairing the vehicles pursuant to the express warranty, Ford falsely informed class members that there was no problem with their vehicle, performed ineffective software flashes, or replaced defective components in the PowerShift Transmissions with equally defective components, without actually repairing the vehicles.

308.   Plaintiffs and the other Class Members are entitled to legal and equitable relief against Defendant, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## SIXTH CAUSE OF ACTION

### Violation of Colorado Consumer Protection Act – Colo. Rev. Stat. §§ 6-1-101, *et seq*.

### (On Behalf of the Colorado Sub-Class)

309.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

310.   Plaintiff Patricia Soltesiz (the "Colorado Plaintiff") brings this cause of action on behalf of herself and on behalf of the members of the Colorado Sub-Class.

311.   Defendant is a "person" as defined by the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-102.

312.   Colorado's Consumer Protection Act (the "CCPA") prohibits a person from engaging in a "deceptive trade practice," including "knowingly

1    mak[ing] a false representation as to the characteristics, ingredients, uses,

2    benefits, alterations, or quantities of goods […];" "represent[ing] that goods,

3    good, services, or property are of a particular standard, quality, or grade, […] if

4    he knows or should know that they are of another;" and "advertis[ing] goods,

5    services, or property with intent not to sell them as advertised." Colo. Rev. Stat.

6    § 6-1-105(1)(e), (g), and (i).

7        313.   By failing to disclose and concealing the defective nature of the

8    transmissions from Colorado Plaintiff and other Colorado Sub-class Members,

9    Defendant violated the CCPA, as it represented that the Class Vehicles and their

10   transmissions had characteristics and benefits that they do not have; represented

11   that the Class Vehicles and their transmissions were of a particular standard,

12   quality, or grade when they were of another; advertised Class Vehicles with the

13   intent not to sell them as advertised; and otherwise engaged in conduct likely to

14   deceive.

15       314.   Defendant's unfair and deceptive acts or practices occurred

16   repeatedly in Defendant's trade or business, were capable of deceiving a

17   substantial portion of the purchasing public, and imposed a serious safety risk on

18   the public.

19       315.   Defendant knew that the Class Vehicles and their transmissions

20   suffered from an inherent defect, were defectively designed or manufactured, and

21   were not suitable for their intended use.

22       316.   As a result of Defendant's omissions and/or misrepresentations,

23   owners and/or lessees of the Class Vehicles suffered an ascertainable loss of

24   money, property, and/or value of their Class Vehicles.  Additionally, as a result

25   of the Transmission Defect, Plaintiffs and the Class Members were harmed and

26   suffered actual damages in that the Class Vehicles' transmissions are

27   substantially certain to fail before their expected useful life has run.

28       317.   Defendant's conduct was the direct and proximate cause of

1  Colorado Plaintiff and other Colorado Sub-Class Members injuries.

2      318.   As a result of Defendant's conduct, Colorado Plaintiff and Colorado

3  Sub-Class Members were harmed and suffered actual damages in that the Class

4  Vehicles experienced and will continue to experience transmission slips, kicking

5  forward, jerking, increased stopping times, premature internal wear, delayed

6  acceleration, and, eventually, transmission failure.

7  ### SEVENTH CAUSE OF ACTION

8  **Violation of Illinois Consumer Fraud and Deceptive Business Practices Act**

9  **– 815 ILCS 505/1, *et seq*. and 720 ILCS 295/1A**

10  **(On Behalf of the Illinois Sub-Class)**

11      319.   Plaintiffs incorporate by reference the allegations contained in the

12  preceding paragraphs of this Complaint.

13      320.   Plaintiff Lindsay Schmidt (the "Illinois Plaintiff") brings this cause

14  of action on behalf of herself and on behalf of the members of the Illinois Sub-

15  Class.

16      321.   Defendant is a "person" as defined by Illinois Compiled Statutes,

17  815 ILCS 505/1(c).

18      322.   Illinois Plaintiff and Illinois Sub-class Members are "consumers"

19  within the meaning of Illinois Compiled Statutes, 815 ILCS 505/1(e) because

20  they purchased their Class Vehicles primarily for personal, family or household

21  use.

22      323.   The Illinois Consumer Fraud and Deceptive Business Practices Act

23  ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but

24  not limit to the use or employment of any deception, fraud, false pretense, false

25  promise, misrepresentation or the concealment, suppression or omission of any

26  material fact, with intent that other rely upon the concealment, suppression or

27  omission of such material fact … in the conduct of trade or commerce …

28  whether any person has in fact been misled, deceived or damaged thereby."  815

1    ILCS 505/2.

2         324.   By failing to disclose and concealing the defective nature of the

3    transmissions from Illinois Plaintiff and other Illinois Sub-class Members,

4    Defendant violated the Illinois CFA, as it represented that the Class Vehicles and

5    their transmissions had characteristics and benefits that they do not have,

6    represented that the Class Vehicles and their transmissions were of a particular

7    standard, quality, or grade when they were of another, and otherwise engaged in

8    conduct likely to deceive.

9         325.   Defendant's unfair and deceptive acts or practices occurred

10   repeatedly in Defendant's trade or business, were capable of deceiving a

11   substantial portion of the purchasing public, and imposed a serious safety risk on

12   the public.

13        326.   Defendant intended for Illinois Plaintiff and other Illinois Sub-Class

14   Members to rely on its aforementioned unfair and deceptive acts and practices,

15   and such unfair and deceptive acts and practices occurred in the course of

16   conduct involving trade or commerce.

17        327.   Defendant knew that the Class Vehicles and their transmissions

18   suffered from an inherent defect, were defectively designed or manufactured, and

19   were not suitable for their intended use.

20        328.   As a result of their reliance on Defendant's omissions and/or

21   misrepresentations, owners and/or lessees of the Class Vehicles suffered an

22   ascertainable loss of money, property, and/or value of their Class Vehicles.

23   Additionally, as a result of the Transmission Defect, Plaintiffs and the Class

24   Members were harmed and suffered actual damages in that the Class Vehicles'

25   transmissions are substantially certain to fail before their expected useful life has

26   run.

27        329.   Defendant was under a duty to Plaintiffs and the Class Members to

28   disclose the defective nature of the transmissions and/or the associated repair

costs because:

330.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' transmissions;

331.   Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that their transmissions had a dangerous safety defect until it manifested; and

332.   Defendant knew that Plaintiffs and the Class Members could not reasonably have been expected to learn of or discover the safety defect.

333.   In failing to disclose the defective nature of the transmissions, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

334.   The facts Defendant concealed from or did not disclose to Illinois Plaintiff and the Illinois Sub-Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less.  Had Illinois Plaintiff and other Illinois Sub-Class Members known that the Class Vehicles' transmissions were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

335.   Illinois Plaintiff and the Illinois Sub-Class members are reasonable consumers who do not expect the transmissions installed in their vehicles to exhibit transmission slips, kicking forward, jerking, premature internal wear, delayed acceleration, and/or difficulty in stopping the vehicle.  This is the reasonable and objective consumer expectation relating to vehicle transmissions.

336.   As a result of Defendant's conduct, Illinois Plaintiff and Illinois Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles experienced and will continue to experience transmission slips, kicking forward, jerking, increased stopping times, premature internal wear, delayed acceleration, and, eventually, transmission failure.

337.   As a result of Defendant's acts and practices, Illinois Plaintiff and other Illinois Sub-Class Members have been damaged in an amount to be proven at trial, including, but not limited to, actual damages, and reasonable costs and attorneys' fees pursuant to 815 ILCS 505/10a.

**EIGHTH CAUSE OF ACTION**

**Violations of the New Jersey Consumer Fraud Act –**

**N.J. Stat. Ann. § 56:8-1, et seq.**

**(On Behalf of the New Jersey Sub-Class)**

338.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

339.   The New Jersey Consumer Fraud Act, N.J. STAT. ANN. §§ 56:8-1, et seq. ("NJCFA") protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…" N.J.S.A. 56:8-2.

340.   Plaintiffs and members of the Class are consumers who purchased and/or leased Vehicles for personal, family or household use.

341.   In the course of Defendant's business, it failed to disclose and actively concealed the Transmission Defect in the Vehicles as described above. Accordingly, Defendant has engaged in unfair and deceptive trade practices, including representing that the Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Vehicles are of a particular standard and quality when they are not; advertising the Vehicles with the intent to not sell them as advertised; and otherwise engaging in conduct likely to deceive.

342.   Defendant's acts and practices, as described herein, offend established public policy because of the harm they cause to consumers,

motorists, and pedestrians outweighs any benefit associated with such practices, and because Defendant concealed the defective nature of the Vehicles from consumers.

343.   Defendant's actions as set forth above occurred in the conduct of trade or commerce.

344.   Defendant's conduct caused Plaintiffs and Class members to suffer an ascertainable loss. In addition to direct monetary losses, Plaintiffs and Class members have suffered an ascertainable loss by receiving less than what was promised.

345.   Plaintiffs and the other Class members were injured as a result of Defendant's conduct in that Plaintiff and the other Class members overpaid for their Vehicles and did not receive the benefit of their bargain, and their Vehicles suffered a diminution in value.

346.   A causal relationship exists between Defendant's unlawful conduct and the ascertainable losses suffered by Plaintiffs and the Class. Had the Transmission Defect in the Vehicles been disclosed, consumers would not have purchased them or would have paid less for the vehicles had they decided to purchase them.

347.   Pursuant to N.J. STAT. ANN. § 56:8-20, Plaintiffs will serve the New Jersey Attorney General with a copy of this Complaint.

**NINTH CAUSE OF ACTION**

**Violation of New York General Business Law §§ 349, 350, *et seq.***

**(On Behalf of the New York Sub-Class)**

348.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

349.   Plaintiff Patricia Schwennker brings this Count on behalf of herself and members of the New York Sub-Class.

350.   New York's General Business Law § 349 makes unlawful

"[d]eceptive acts or practices in the conduct of any business, trade or commerce."

351.   New York's General Business Law § 350 also makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]"  False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity…."  N.Y. Gen. Bus. Law § 350-a.

352.   Defendant's representations, as alleged above, were and are material to a reasonable consumer and are likely to affect consumer behavior and conduct.

353.   Defendant's act and practices offended public policy and violate numerous state and federal laws.

354.   Defendant's intentional deception of consumers was immoral, unethical, oppressive, and unscrupulous.

355.   Defendant's conduct has caused and continues to cause substantial injury to Plaintiff Schwennker, New York consumers, and others because, as alleged above, consumers paid a premium for Class Vehicles based on representations about their efficiency, functionality, safety and performance. That injury is not outweighed by any countervailing public policy that could justify Defendant's deceptive practices.

356.   Because Plaintiff Schwennker and other members of the New York Sub-Class reasonably relied on Defendant's misrepresentations about the Vehicles, they could not have reasonably avoided that injury.

357.   Defendant's conduct has not resulted in any benefit to consumers or competition.

358.   Defendant's unfair, deceptive practices and false advertising

1    directly, foreseeably, and proximately caused Plaintiff Schwennker and other

2    members of the New York Sub-Class an ascertainable loss because those

3    consumers paid a premium for what they thought were efficient, smooth

4    performing, durable, operable, safe vehicles.

5                         **TENTH CAUSE OF ACTION**

6    **Violation of the Oregon Unlawful Trade Practices Act – Or. Rev. Stat. §§**

7                         **646.605, *et seq.***

8                     **(On Behalf of the Oregon Sub-Class)**

9        359.   Plaintiffs incorporate by reference the allegations contained in the

10   preceding paragraphs of this Complaint.

11       360.   Plaintiff Christi Groshong (the "Oregon Plaintiff") brings this cause

12   of action on behalf of herself and on behalf of the members of the Oregon Sub-

13   Class.

14       361.   Defendant was at all relevant times a person within the meaning of

15   Or. Rev. Stat § 646.605(4).

16       362.   The Class Vehicles at issue are "goods" obtained primarily for

17   personal, family, or household purposes within the meaning of Or. Rev. Stat. §

18   646.605(6).

19       363.   The Oregon Unlawful Trade Practices Act ("Oregon UTPA")

20   prohibits a person from, in the course of the person's business, doing any of the

21   following: "(e) Represent[ing] that real estate, goods or services have

22   sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or

23   qualities that the real estate, goods or services do not have […]; (g)

24   Represent[ing] that real estate, goods or services are of a particular standard,

25   quality, or grade,[…], if the real estate, goods or services are of another; (i)

26   Advertis[ing] real estate, goods or services with intent not to provide the real

27   estate, goods or services as advertised[…];" and "(u) Engag[ing] in any other

28   unfair or deceptive conduct in trade or commerce."  Or. Rev. Stat. § 646.608(1).

364. By failing to disclose and concealing the defective nature of the transmissions from Oregon Plaintiff and Oregon Sub-Class Members, Defendant violated the Oregon UTPA, as it represented that the Class Vehicles and their transmissions had characteristics, benefits, and qualities that they do not have, represented that the Class Vehicles and their transmissions were of a particular standard, quality, or grade when they were of another, advertised Class Vehicles with the intent not to sell them as advertised, and otherwise engaged in conduct likely to deceive.

365. Defendant's unlawful or deceptive acts or practices were likely to and did in fact deceive reasonable consumers; including Plaintiff, about the true performance and characteristics of the PowerShift Transmission.

366. Defendant intended for Oregon Plaintiff and other Oregon Sub-Class Members to rely on its aforementioned unlawful practices, and such unlawful practices occurred in the course of conduct involving trade or commerce.

367. Defendant knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

368. As a result of their reliance on Defendant's omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Plaintiffs and the Class Members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

369. Defendant was under a duty to Oregon Plaintiff and the Oregon Sub-Class Members to disclose the defective nature of the transmissions and/or the associated repair costs because:

370. Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' transmissions;

371. Oregon Plaintiff and the Oregon Sub-Class Members could not reasonably have been expected to learn or discover that their transmissions had a dangerous safety defect until it manifested; and

372. Defendant knew that Oregon Plaintiff and the Oregon Sub-Class Members could not reasonably have been expected to learn of or discover the safety defect.

373. In failing to disclose the defective nature of the transmissions, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

374. The facts Defendant concealed from or did not disclose to Oregon Plaintiff and the Oregon Sub-Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less. Had Oregon Plaintiff and other Oregon Sub-Class Members known that the Class Vehicles' transmissions were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

375. Oregon Plaintiff and the Oregon Sub-Class Members are reasonable consumers who do not expect the transmissions installed in their vehicles to exhibit transmission slips, kicking forward, jerking, premature internal wear, delayed acceleration, and/or difficulty in stopping the vehicle. This is the reasonable and objective consumer expectation relating to vehicle transmissions.

376. As a result of Defendant's conduct, Oregon Plaintiff and Oregon Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles experienced and will continue to experience transmission slips, kicking forward, jerking, increased stopping times, premature internal wear, delayed acceleration, and, eventually, transmission failure.

377.   As a result of Defendant's acts and practices, Oregon Plaintiff and other Oregon Sub-Class Members are entitled to recover the greater or actual damages or $200 and reasonable attorneys' fees and costs, pursuant to Or. Rev. Stat. § 646.638.

### ELEVENTH CAUSE OF ACTION

### Violation of the Pennsylvania Unfair Trade Practices and
### Consumer Protection Law – 73 P.S. § 201-1, *et seq.*
### (On Behalf of the Pennsylvania Sub-Class)

378.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

379.   Plaintiffs Jason Porterfeld, Jamie Porterfeld, and Abigail Fisher (the "Pennsylvania Plaintiffs") assert this claim on behalf of themselves and the other members of the Pennsylvania Sub-Class.

380.   The Pennsylvania Plaintiffs and the Pennsylvania Sub-Class purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

381.   All of the acts complained of herein were perpetrated by Defendant in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

382.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") prohibits unfair or deceptive acts or practices, including:  (i) "Representing that goods or services have … characteristics, …. [b]enefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."  73 P.S. § 201-2(4).

383.   Defendant engaged in unlawful trade practices, including representing that Class Vehicles have characteristics, uses, benefits, and qualities

which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

384.   In the course of its business, Defendant concealed the Transmission Defect as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

385.   Defendant has known of the Transmission Defect and the true nature of its PowerShift transmission system when it sold the Vehicles, but concealed all of that information.

386.   By failing to disclose and by actively concealing the Transmission Defect and the true nature of its PowerShift transmission system, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Defendant engaged in unfair and deceptive business practices in violation of the UTPCPL.

387.   Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Pennsylvania Plaintiffs, about the true performance and characteristics of the Class Vehicles.

388.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Pennsylvania Plaintiffs and the Pennsylvania Sub-Class.

389.   Defendant knew or should have known that its conduct violated the UTPCPL.

390.   Because Defendant fraudulently concealed the Transmission Defect, the value of the Class Vehicles has greatly diminished.

391.   Defendant's concealment of the true characteristics of the PowerShift Transmission was material to the Pennsylvania Plaintiffs and the Pennsylvania Sub-Class.

392.   The Pennsylvania Plaintiffs and the Pennsylvania Sub-Class suffered ascertainable loss caused by Defendant's misrepresentations and its concealment of and failure to disclose material information.

393.   Defendant had an ongoing duty to all its customers to refrain from unfair and deceptive acts or practices under the UTPCPL.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendant's deceptive and unfair acts and practices that occurred in the course of Defendant's business.

394.   As a direct and proximate result of Defendant's violations of the UTPCPL, the Pennsylvania Plaintiffs and the Pennsylvania Sub-Class have suffered injury-in-fact and/or actual damage.

395.   Defendant is liable to the Pennsylvania Plaintiffs and the Pennsylvania Sub-Class for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.  *See* 73 P.S. § 201-9.2(a).  The Pennsylvania Plaintiffs and the Pennsylvania Sub-Class are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## TWELFTH CAUSE OF ACTION

### Violation of the Washington Consumer Protection Act – Wash. Rev. Code § 19.86.10 et seq.

**(On Behalf of the Washington Sub-Class)**

396.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

397.   Plaintiff Eric Dufour (the "Washington Plaintiff") asserts this claim on behalf of himself and the other members of the Washington Sub-Class.

398.   All of the acts complained of herein were perpetrated by Defendant in the course of trade or commerce within the meaning of RCW § 19.86.020.

399.   The Washington Consumer Protection Act ("WCPA") prohibits unfair or deceptive acts or practices.  Defendant engaged in unlawful trade practices, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

400.   In the course of its business, Defendant concealed the Transmission Defect as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

401.   Defendant has known of the Transmission Defect and the true nature of its PowerShift transmission system when it sold the Vehicles, but concealed all of that information.

402.   By failing to disclose and by actively concealing the Transmission Defect and the true nature of its PowerShift transmission system, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by

CLASS ACTION COMPLAINT

1   presenting itself as a reputable manufacturer that valued safety, cleanliness,

2   performance and efficiency, and stood behind its vehicles after they were sold,

3   Defendant engaged in unfair and deceptive business practices in violation of the

4   WCPA.

5        403.   Defendant knew or should have known that its conduct violated the

6   WCPA.

7        404.   Because Defendant fraudulently concealed the Transmission Defect,

8   the value of the Class Vehicles has greatly diminished.

9        405.   The Washington Plaintiff and the Washington Sub-Class suffered

10   ascertainable loss caused by Defendant's misrepresentations and its concealment

11   of and failure to disclose material information.

12        406.   Defendant had an ongoing duty to all its customers to refrain from

13   unfair and deceptive acts or practices under the WCPA.  All owners of Class

14   Vehicles suffered ascertainable loss in the form of the diminished value of their

15   vehicles as a result of Defendant's deceptive and unfair acts and practices that

16   occurred in the course of Defendant's business.

17        407.   As a direct and proximate result of Defendant's violations of the

18   WCPA, the Washington Plaintiffs and the Washington Sub-Class have suffered

19   injury-in-fact and/or actual damage, in an amount to be determined at trial,

20   including attorneys' fees, costs, and treble damages.

21   <strong>THIRTEENTH CAUSE OF ACTION</strong>

22   <strong>Breach of Implied Warranty of Merchantability</strong>

23   <strong>Wash. Rev. Code § 62A.2-614</strong>

24   <strong>(On Behalf of the Washington Sub-Class)</strong>

25        408.   Plaintiffs incorporate by reference the allegations contained in the

26   preceding paragraphs of this Complaint.

27        409.   Plaintiff Eric Dufour (the "Washington Plaintiff") brings this cause

28   of action against Defendant on behalf of themselves and on behalf of the other

1    members of the Washington Sub-Class.

2         410.   Defendant was at all relevant times the manufacturer, distributor,

3    warrantor, and/or seller of the Class Vehicles.  Defendant knew or had reason to

4    know of the specific use for which the Class Vehicles were purchased or leased.

5         411.   Defendant provided Washington Plaintiff and Class Members with

6    an implied warranty that the Class Vehicles and their components and parts are

7    merchantable and fit for the ordinary purposes for which they were sold.

8    However, the Class Vehicles are not fit for their ordinary purpose of providing

9    reasonably reliable and safe transportation because, inter alia, the Class Vehicles

10   and their transmissions suffered from an inherent defect at the time of sale and

11   thereafter are not fit for their particular purpose of providing safe and reliable

12   transportation.

13        412.   Defendant impliedly warranted that the Class Vehicles were of

14   merchantable quality and fit for such use.  This implied warranty included,

15   among other things:  (i) a warranty that the Class Vehicles and their

16   transmissions were manufactured, supplied, distributed, and/or sold by Ford

17   were safe and reliable for providing transportation; and (ii) a warranty that the

18   Class Vehicles and their transmissions would be fit for their intended use while

19   the Class Vehicles were being operated.

20        413.   Contrary to the applicable implied warranties, the Class Vehicles

21   and their transmissions at the time of sale and thereafter were not fit for their

22   ordinary and intended purpose of providing Plaintiffs and the Class Members

23   with reliable, durable, and safe transportation.  Instead, the Class Vehicles are

24   defective, including, but not limited to, the defective design and manufacture of

25   their transmissions.

26        414.   As a result of Defendant's breach of the applicable implied

27   warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable

28   loss of money, property, and/or value of their Class Vehicles. Additionally, as a

1  result of the Transmission Defect, Plaintiffs and the Class Members were harmed

2  and suffered actual damages in that the Class Vehicles' transmissions are

3  substantially certain to fail before their expected useful life has run.

4      415.   Defendant's actions, as complained of herein, breached the implied

5  warranty that the Class Vehicles were of merchantable quality and fit for such

6  use in violation of California Civil Code §§ 1792 and 1791.1.

**FOURTEENTH CAUSE OF ACTION**

**Breach of Warranty under the Magnuson-Moss**

**Warranty Act – 15 U.S.C. § 2303 *et seq.***

(**On Behalf of the Nationwide Class, or, in the Alternative, the California Sub-Class**)

12      416.   Plaintiffs incorporate by reference the allegations contained in the

13  preceding paragraphs of this Complaint.

14      417.   Plaintiffs bring this cause of action on behalf of themselves and on

15  behalf of all Class Members, or, in the alternative, the California Sub-Class.

16      418.   The Class Vehicles are a "consumer product" within the meaning of

17  the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

18      419.   Plaintiffs and Class Members are "consumers" within the meaning

19  of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

20      420.   Defendant is a "supplier" and "warrantor" within the meaning of the

21  Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

22      421.   Defendant's express warranty is a "written warranty" within the

23  meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

24      422.   Ford provided all purchasers and lessees of the Class Vehicles with

25  a New Vehicle "Bumper to Bumper" Limited Warranty and a Powertrain

26  Limited Warranty with the purchase or lease of the Class Vehicles.  In this

27  Bumper to Bumper Limited Warranty, Ford expressly warranted that its dealers

28  would "without charge, **repair, replace, or adjust all parts on your vehicle**

**that malfunction or fail** during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" if the vehicle is properly operated and maintained and was taken to a Ford dealership for a warranty repair during the warranty period. Under this "Bumper to Bumper Coverage," Ford promised to cover "all parts on [the] vehicle" "for three years – unless you drive more than 36,000 miles before three years elapse. In that case, your coverage ends at 36,000 miles."

423. Furthermore, under the Powertrain Limited Warranty, Ford expressly warranted that it would cover listed powertrain components under its Powertrain Limited Warranty, including transmission components (including the "Transmission: all internal parts, clutch cover, seals and gaskets, torque converter, transfer case (including all internal parts), transmission case, transmission mounts") "for five years or 60,000 miles, whichever occurs first."

424. On information and belief, Defendant breached the express warranty by:

> (a)     Extending a 3 year/36,000 mile Bumper to Bumper Limited Warranty and 5 year/60,000 mile Powertrain Limited Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship, including the subject transmission, at no cost to the owner or lessee;

> (b)     Selling and leasing Class Vehicles with transmissions that were defective in material and workmanship, requiring repair or replacement within the warranty period;

> (c)     Refusing to honor the express warranty by repairing or replacing, free of charge, the transmission or any of its component parts or programming and instead charging for repair and replacement parts; and

     (d)     Purporting to repair the transmission and its component parts by replacing the defective transmission components with the same defective components and/or instituting temporary fixes, on information and belief, to ensure that the Transmission Defect manifests outside of the Class Vehicles' express warranty period.

425.  Furthermore, Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things:  (i) a warranty that the Class Vehicles and their transmissions were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

426.  Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including, but not limited to, the defective design of their transmissions.

427.  Defendant's breach of express and implied warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

428.  The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

429.  Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the transmission.

430.   As a direct and proximate cause of Defendant's breach of express and implied warranties, Plaintiffs and Class Members sustained damages and other losses in an amount to be determined at trial.  Defendant's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

431.   Additionally, Ford breached the express warranty by performing illusory repairs.  Rather than repairing the vehicles pursuant to the express warranty, Ford falsely informed class members that there was no problem with their vehicles, performed ineffective software updates, or replaced defective components in the PowerShift Transmissions with equally defective components, without actually repairing the vehicles.

432.   As a result of Defendant's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

### FIFTEENTH CAUSE OF ACTION

### Breach of Express Warranty

### (On Behalf of the Nationwide Class or,

### Alternatively, each of the State Sub-Classes)

433.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

434.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, on behalf of each of the State Sub-Classes, against Defendant.

435.   Defendant expressly warranted that the Vehicles were of high quality and, at minimum, would actually work properly. Defendant also expressly warranted that they would repair and/or replace defects in material and/or workmanship free of charge that occurred during the new vehicle and

1  certified preowned ("CPO") warranty periods.

2      436.   Plaintiffs relied on Defendant's express warranties when purchasing

3  their Vehicles.

4      437.   Defendant breached this warranty by selling to Plaintiffs and the

5  Class members the Vehicles with known Transmission Defects, which are not of

6  high quality, and which are predisposed to fail prematurely and/or fail to

7  function properly.

8      438.   As a result of Defendant's actions, Plaintiffs and the Class members

9  have suffered economic damages including, but not limited to, costly repairs,

10  loss of vehicle use, substantial loss in value and resale value of the vehicles, and

11  other related damage.

12      439.   Defendant's attempt to disclaim or limit these express warranties

13  vis-à-vis consumers is unconscionable and unenforceable under the

14  circumstances here. Specifically, Defendant's warranty limitation is

15  unenforceable because they knowingly sold a defective product without

16  informing consumers about the defect.

17      440.   The time limits contained in Defendant's warranty period were also

18  unconscionable and inadequate to protect Plaintiffs and members of the Class.

19  Among other things, Plaintiffs and Class members had no meaningful choice in

20  determining these time limitations, the terms of which unreasonably favored

21  Defendant. A gross disparity in bargaining power existed between Defendant and

22  the Class members, and Defendant knew or should have known that the Vehicles

23  were defective at the time of sale.

24      441.   Plaintiffs and the Class members have complied with all obligations

25  under the warranty, or otherwise have been excused from performance of said

26  obligations as a result of Defendant's conduct described herein.

27

28

## SIXTEENTH CAUSE OF ACTION

### Breach of the Implied Warranty of Merchantability

### (On Behalf of the Nationwide Class or,

### Alternatively, each of the State Sub-Classes)

442.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

443.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, on behalf of each of the State Sub-Classes, against Defendant.

444.   Defendant is a "merchant" as defined under the Uniform Commercial Code ("UCC").

445.   The Vehicles are "goods" as defined under the UCC.

446.   Defendant impliedly warranted that the Vehicles were of a merchantable quality.

447.   Defendant breached the implied warranty of merchantability, as the Vehicles were not of a merchantable quality due to the Transmission Defect.

448.   As a direct and proximate result of the breach of said warranties, Plaintiffs and Class members were injured, and are entitled to damages.

449.   Defendant's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendant's warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

450.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiffs and member of the Class. Among other things, Plaintiffs and members of the Class had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between

Defendant and Class members, and Defendant knew or should have known that the Vehicles were defective at the time of sale.

451.   Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

## SEVENTEENTH CAUSE OF ACTION

### Breach of the Duty Of Good Faith And Fair Dealing

### (On Behalf of the New Jersey Sub-Class )

452.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

453.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, on behalf of each of the State Sub-Classes, against Defendant.

454.   Every contract in New Jersey contains an implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

455.   Defendant breached the covenant of good faith and fair dealing by, inter alia, failing to notify Plaintiffs and Class members of the Transmission Defect in the Vehicles, and failing to fully and properly repair this defect.

456.   Defendant acted in bad faith and/or with a malicious motive to deny Plaintiffs and the Class members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

**EIGHTEENTH CAUSE OF ACTION**

**Unjust Enrichment**

**(On Behalf of the Nationwide Class or,**

**Alternatively, the California Sub-Class)**

457.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

458.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, on behalf of the California Sub-Class, against Defendant.

459.   As a direct and proximate result of Defendant's failure to disclose known defects and material misrepresentations regarding known defects, Defendant has profited through the sale and lease of said vehicles.  Although these vehicles are purchased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

460.   Additionally, as a direct and proximate result of Defendant's failure to disclose known defects and material misrepresentations regarding known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

461.   Defendant has therefore been unjustly enriched due to the known defects in the Class Vehicles through the use of funds that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiffs and Class Members.

462.   As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

## RELIEF REQUESTED

463.   Plaintiffs, on behalf of themselves, and all others similarly situated, requests the Court to enter judgment against Defendant, as follows:

(a)   An order certifying the proposed Class and Sub-Classes, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

(b)   A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the transmission, including the need for period maintenance;

(c)   An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, and to remove and replace Plaintiffs and Class Members' transmissions with a suitable alternative product; enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement transmission that does not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class members that such warranty has been reformed;

(d)   A declaration requiring Defendant to comply with the various provisions of the state and federal consumer protection statutes herein alleged and to make all the required disclosures;

(e)   An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, and including the additional purchase cost of the PowerShift

1    Transmission option, in an amount to be proven at trial;

2    (f)    Any and all remedies provided pursuant to the state and

3    federal consumer protection statutes herein alleged;

4    (g)    A declaration that Defendant must disgorge, for the benefit of

5    the Class, all or part of the ill-gotten profits it received from

6    the sale or lease of its Class Vehicles, or make full restitution

7    to Plaintiffs and Class Members;

8    (h)    An award of attorneys' fees and costs, as allowed by law;

9    (i)    An award of attorneys' fees and costs pursuant to California

10    Code of Civil Procedure § 1021.5;

11    (j)    An award of pre-judgment and post-judgment interest, as

12    provided by law;

13    (k)    Leave to amend the Complaint to conform to the evidence

14    produced at trial;

15    (l)    Plaintiffs demand that Ford perform a recall, and repair all

16    vehicles; and

17    (m)    Such other relief as may be appropriate under the

18    circumstances.

19

20

21

22

23

24

25

26

27    ///

28    ///

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DEMAND FOR JURY TRIAL

464.   Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Dated:  November 12, 2015

Respectfully submitted,

CAPSTONE LAW APC


By:  /s/ Jordan L. Lurie
    Jordan L. Lurie
    Robert Friedl
    Tarek H. Zohdy
    Cody R. Padgett

    BERGER & MONTAGUE, P.C.

    Russell D. Paul
    Eric Lechtzin
    1622 Locust Street
    Philadelphia, PA  19103
    Tel:  (215) 875-3000
    Fax:  (215) 875-4604
    rpaul@bm.net
    elechtzin@bm.net

    Attorneys for Plaintiffs and the Class

CLASS ACTION COMPLAINT